KIMBALL, Chief Justice.
 
 *
 

 | ,We granted certiorari in this matter to determine whether the court of appeal correctly applied the appropriate standard of review in amending the jury verdict to award a total of $272,272.32 to plaintiff for injuries allegedly sustained in an automobile accident. Further, we granted certio-rari in this matter to determine whether the court of appeal erred in reversing the trial court’s denial of plaintiffs request for a new trial. Finally, we must determine whether the court of appeal erred in finding defendant, Progressive Security Insurance Company, acted in an arbitrary and capricious manner in failing to make a second unconditional tender to plaintiff, thereby warranting an award of penalties in the amount of $8,740.00 and an award of attorney’s fees in the amount of $25,000. For the reasons that follow, we find the court of appeal was in error in all of the above respects and therefore, reverse its ruling in that regard and reinstate the jury’s verdict.
 

 |2Facts and Procedural History
 

 On the morning of January 14, 2005, plaintiff Byron Guillory was transporting his daughter to her school bus stop in Lafayette, Louisiana in his 2000 Ford F-250 diesel three-quarter ton pickup truck. While traveling in the right turning lane of Kaliste Saloom Road, with the intent to turn right on Camellia, plaintiff was struck on his left rear quarter panel and bumper by a 1998 Ford Explorer driven by defendant Jennifer D. Lee, who was transporting herself and her passenger Amy Young to school. The passenger side of the Explorer scraped alongside the driver side of the truck, causing damage to the passenger side of the Explorer, as well as causing the passenger side mirror of the Explorer to break from its bracket. Lee maintained that while she was traveling in the far right lane next to the turning lane on Kaliste Saloom, a Cox Communications service van on her left veered into her lane, causing her to take evasive action to the right, which in turn caused her to strike plaintiff’s vehicle. Lee was cited for careless operation of a vehicle, and no injuries were reported by any party to the investigating officer at the scene of the accident. An independent witness to the accident, Sally Jones, later gave a statement and testified that she saw no Cox Communications van in the vicinity at the time of the accident. Plaintiff also testified that he did not see a Cox van at the time of the accident.
 

 Although plaintiff reported no injuries at the scene of the accident, on January 11, 2006, plaintiff filed suit in the 15th Judicial District Court against several defendants, including Jennifer D. Lee (hereinafter “Lee”), Donna Lee, State Farm Insurance Company, and plaintiffs own insurer, Progressive Security Insurance Company (“Progressive”),
 
 [1]
 
 for injuries to his back, neck, and thumb allegedly | ^sustained as a result of the subject accident. Progressive answered plaintiffs Petition on April 27, 2006, and filed a Supplemental and Amending Answer on May 10, 2006, asserting the affirmative defense that a third party for whom Progressive is not responsible, namely Cox Communications, caused a sudden emergency to which defendant
 
 *1110
 
 Lee had to react. On April 6, 2006, plaintiff filed a First Supplemental and Amending Petition for Damages, naming Cox Communications as an additional defendant. Cox answered plaintiffs Amending Petition on October 31, 2006.
 

 On December 12, 2006, the trial court signed a judgment of dismissal, dismissing defendants State Farm Insurance Company, Jennifer D. Lee, and Donna Lee, as a result of a settlement among them. According to the record, plaintiff received the $10,000 policy limits of Lee’s State Farm policy as a result of this settlement. Also, under the terms of his insurance policy with Progressive, plaintiff received a tender of the full $5,000 medical payments coverage from Progressive at some point between the date of the accident and the time plaintiff filed his lawsuit.
 
 [2]
 
 Plaintiff also received an unconditional tender from Progressive on February 22, 2006, in the amount of $5,020, based upon its evaluation of the insured’s claim to date.
 

 On July 26, 2007, plaintiff filed a Second Supplemental and Amending Petition for Damages, asserting a claim for penalties and attorney’s fees as a result of Progressive’s alleged arbitrary and capricious behavior in failing to make an unconditional tender to plaintiff.
 
 [3]
 

 |jA four day jury trial began in Acadia Parish on October 27, 2009, and concluded on November 1, 2007. The jury unanimously found defendant Jennifer Lee was negligent and 100% at fault for the accident that occurred on January 14, 2005, and further found the Cox Communications driver was not negligent, nor was he a cause of the accident. The jury did find plaintiff was injured as a result of the subject accident, and awarded him $40,000 for past medical expenses, $10,000 for future medical expenses, and $10,000 for physical and mental pain and suffering, past and future. The jury gave plaintiff no award for loss of enjoyment of life. Finally, the jury found no arbitrary or capricious behavior on the part of Progressive for an alleged failure to pay plaintiffs claim timely after receiving satisfactory proof of loss. A judgment to this effect was rendered and signed by the trial court on November 16, 2007.
 

 Also on November 16, 2007, plaintiff filed a Motion for Judgment Notwithstanding the Verdict or in the Alternative for New Trial or Additur (“Motion for JNOV”), asserting that the awards rendered by the jury in this matter were abusively low with respect to the evidence offered at trial and could not be reconciled, as plaintiff set forth itemized medical expenses which totaled $98,272.32. Accord
 
 *1111
 
 ing to the plaintiff, based upon the jury’s query regarding health insurance during deliberation and its award for only $40,000 for past medical expenses, the only logical explanation is that the jury chose to ignore the trial judge’s instruction on the collateral source rule and discounted health insurance payments made to medical care ^providers on the plaintiffs behalf.
 
 [4]
 

 Also in its Motion for JNOV, plaintiff asserted that the jury’s award for past and future mental pain and suffering of $10,000 is so woefully inadequate as to be an abuse of the jury’s discretion. Further, concerning the jury’s non-award for loss of enjoyment of life, plaintiff argued that not only did plaintiffs doctors place weight (lifting) restrictions on him, plaintiffs own testimony showed that although he was able to participate in certain activities and hobbies after the accident, he could not do so without experiencing pain. Finally, concerning plaintiffs bad faith claims for penalties against Progressive under La. R.S. 22:658 and La. R.S. 22:1220,
 
 [5]
 
 plaintiff asserted the jury’s determination that Progressive did not act in an arbitrary and |f,capricious manner is contrary to both the law and the evidence.
 
 [6]
 

 
 *1112
 
 Progressive opposed plaintiffs Motion for JNOV, stating that the jury’s findings were supported by both evidence and the law. More specifically, Progressive asserted the evidence established that the impact between Lee and plaintiff was minor, as plaintiff, a chronic pain patient under active medical treatment at the time of the accident, denied any injuries following the accident. Moreover, plaintiff failed to acknowledge or apply the appropriate standards for granting a JNOV, new trial, or additur, as found in the Louisiana Code of Civil Procedure. Progressive argued the jury’s awards were reasonable in light of the evidence presented. Plaintiffs medical expenses for the diagnostic tests and treatment he underwent, but not the expenses related to his surgeries or treatment for temporomandibular joint disorder (“TMJ”), totaled approximately $40,000, which was the jury’s award for past medical expenses.
 

 Secondly, regarding the award for past and future mental pain and suffering as well as the non-award for loss of enjoyment of life, Progressive argued plaintiff possessed a chronic pain condition and other pre-existing medical problems prior to the accident. Furthermore, plaintiff reported to Dr. Norman E. Anseman, M.D. (“Dr. Anseman”), one of his treating physicians, that he was 85% better approximately nine months following the accident. Also, according to Progressive, plaintiff participated in several activities in the year(s) following the accident, including numerous elk 17hunting trips to New Mexico, sailing in the Carribean, and fishing in Cabo San Lucas. As a result, the jury concluded that the subject accident caused plaintiff only minor periods of minimal aggravation of his pre-existing condition, and its verdict was reasonable in light of the evidence presented.
 

 Finally, concerning plaintiffs bad faith claim against Progressive, it argued the jury was instructed that an insurer is not in bad faith when there is a reasonable and legitimate question as to the extent and causation of the claim, and further, statutory penalties are inappropriate when the insurer has a reasonable basis to defend the claim and acts in good faith reliance on that defense. Given the evidence presented at trial regarding the causal connection of plaintiffs claims to this accident and the jury’s corresponding award, Progressive argued it is clear that reasonable minds could differ and the jury’s objection to the claim was reasonable.
 

 Following a hearing on December 17, 2007, a judgment was issued on February 14, 2008, denying plaintiffs Motion for Judgment Notwithstanding the Verdict or in the Alternative for New Trial or Addi-tur.
 
 [7]
 

 Plaintiff timely appealed to the Court of Appeal, Third Circuit, urging the jury erred in awarding him less than the special and general damages he sought, as well as citing error in the jury’s refusal to find that Progressive was arbitrary and capricious in its handling of his claim. Plaintiff also appealed the trial court’s denial of his motion for a JNOV
 
 [8]
 
 and for a new trial. The court of appeal affirmed only the jury’s finding of fault, and reversed the
 
 *1113
 
 trial court’s denial of a new trial on all counts, |sfinding the record evidence sufficient to render appropriate awards without remand. Specifically, the appellate court: (1) increased the jury’s verdict to award $98,272.32 in past medical expenses; (2) awarded $150,000 for past and future physical and mental pain and suffering; (3) reversed the trial court’s denial of damages for loss of enjoyment of life and awarded $24,000; and (4) reversed the trial court’s denial of damages for arbitrary and capricious conduct of the defendant, Progressive, and awarded a penalty of $8,740.00 plus attorney fees and costs in the amount of $25,000.
 

 In its opinion, the appellate court initially noted its standard of review that it may not set aside a trial court’s findings of fact in the absence of manifest error or unless it is clearly wrong, citing
 
 Stobart v. State, Through DOTD,
 
 617 So.2d 880 (La.1993), and
 
 Rosell v. ESCO,
 
 549 So.2d 840 (La.1989). Thereafter, the court of appeal recited the testimony of plaintiff and Dr. Anseman at length to conclude the January 14, 2005, accident worsened plaintiffs cervical problems, causing a new disc herniation at C6-7, an aggravation and re-injury of the disc at the C5-6 level, aggravation of carpel tunnel syndrome bilaterally, aggravation of plaintiffs TMJ, and a left iliolumbar ligament strain that aggravated a prior lumbar condition. The court pointed to plaintiffs testimony that after the accident, he had constant neck and back pain at a higher level, with pain and numbness shooting down his arms, without exertion. While finding credible Dr. Anse-man’s testimony relating the C6-7 disc herniation and subsequent surgeries to this accident, the appellate court specifically declined to credit the testimony of Dr. Vic Parmar, Progressive’s independent medical examiner, who opined plaintiffs herniated disc was not caused by the January, 2005, accident because plaintiffs February, 2005, MRI did not show a herniation at C6-7.
 

 In finding the jury award for past medical expenses was contrary to the law and evidence, the court of appeal reasoned that Dr. Feldman testified both his treatment Lof plaintiff and the discectomies he performed on plaintiff shortly before trial were a result of the subject accident. As such, the court concluded the jury award was contrary to the law and evidence and amended the jury’s award from $40,000 to $98,272.32, citing
 
 Abshire v. Wilkenson,
 
 01-75, (La.App. 3 Cir. 5/30/01), 787 So.2d 1158, as an analogous case.
 
 [9]
 

 In addressing the jury’s award of general damages in the amount of $10,000, the court of appeal found that even though plaintiff had “flare-ups” of pain depending on his activity before the accident, he testified that he had constant pain in his neck and back and shooting pain down his arms without activity after the accident. Furthermore, the court of appeal noted the plaintiffs treatment by Dr. James A. Pearce, D.D.S. for aggravation of his TMJ condition consisted of many restrictions within normal activities like standing, sitting, laying, and walking. The appellate court noted as well that plaintiff testified as to the great emotional pain and suffering he endured, having been the primary care taker of his wife prior to the instant accident as a result of her involvement in a
 
 *1114
 
 ear accident
 
 [10]
 
 causing a form of brain damage which prevented her from being able to bathe or cook without help. The court of appeal relied upon plaintiffs testimony that his daughter was required to assist in the care of her mother, as well as plaintiffs concern regarding his inability to participate in certain activities with his daughter. The appellate court also noted neck injuries are also aggravated by mental stress which plaintiff, an attorney, faces as an unavoidable hazard.
 

 The court stated plaintiff was also prescribed increases in the strength and | mfrequency of his pain medications, which required plaintiff to manage his pain and medication without interfering with his thinking processes at work. Ultimately, the appellate court found, the increase in pain medication was not enough, as plaintiff had to undergo a discogram and two discectomies. The court of appeal cited Dr. Feldman’s testimony, in which he stated it was too soon to know whether the discectomies would be successful. Thus, the court of appeal speculated, if the dis-cectomies are not successful, this will require more medication and a possible two-level fusion that requires numerous restrictions and a lengthy recovery time. The appellate court therefore found three years of past physical and mental pain and suffering and the probability of ongoing pain and suffering entitled plaintiff to an increased damage award of $150,000. Similarly, the court found plaintiff established a decrease in his ability to do certain activities without pain and the imposition of certain restrictions placed on him by his doctor inhibited his normal daily life. As such, the court awarded plaintiff $24,000 for daily loss of enjoyment of life which it found was continuing at trial and would continue into the future.
 

 Contrary to the jury’s finding, the court of appeal also concluded Progressive’s conduct in its failure to timely make a second tender to plaintiff was arbitrary and capricious.
 
 [11]
 
 The court found Progressive failed to timely resolve its issues of liability and causation and the extent of related damages, and also that Progressive did not transcribe the January, 2005, statements and the statement of Sally Jones, until May 18, 2006. The depositions of defendant Lee, her passenger Amy Young, the Cox | nvan driver (Shannon Vice), and witness Sally Jones, were not taken until June, 2007.
 
 [12]
 
 Because of the conflicting testimony given in the Lee and Young depositions, Progressive was required to take substantive and affirmative steps to accumulate the facts necessary to evaluate a claim under
 
 McClendon v. Economy Fire & Cas. Ins. Co.,
 
 98-1537 (La.App. 3 Cir. 4/7/99), 732 So.2d 727 (holding La. R.S. 22:658(A)(3) requires that an insurer
 
 *1115
 
 take some substantive and affirmative step to accumulate the facts necessary to evaluate the claim). As a result, the CA concluded Progressive was arbitrary and capricious in not taking the depositions in a timely manner.
 

 Plaintiff had also asserted at the court of appeal that he was entitled to penalties and attorney’s fees under La. R.S. 22:658 and La. R.S. 22:1220, asserting specifically that the 2006 version of La. R.S. 22:658 applies to this 2005 accident to entitle him to all damages incurred plus a penalty of fifty percent damages on the amount found to be due or, in the ease of a partial tender, fifty percent of the difference between the amount tendered and the amount that should have been tendered, plus attorney fees and costs.
 
 [13]
 
 The appellate court, relying on dicta in
 
 Sher v. Lafayette Ins. Co.,
 
 07-2441, 07-2443 (La.4/08/08), 988 So.2d 186,
 
 [14]
 
 which ultimately held that La. R.S. | ,222:658 is substantive law and cannot be applied retroactively, found that the 2006 amended version of the statute applies to plaintiffs claim. Specifically, the court found that although plaintiffs claim for medical damages was paid (with some surplus) as of February, 2006, plaintiff continued to receive treatment and incur expenses, and thus asked for another tender in June, 2006, which was rejected. Thus, the court of appeal reasoned, pursuant to
 
 Sher
 
 and because Progressive should have made a tender within thirty days of Dr. Anse-man’s deposition (taken in April, 2007), plaintiffs claim for these damages constitutes a claim that arose after the August 15, 2006, amendment to La. R.S. 22:658. The court of appeal concluded plaintiff was therefore entitled to the fifty percent penalty award under the 2006 version of the statute.
 

 Finally, the appellate court concluded that this matter falls squarely under La. C.C.P. art.1972, which provides that a new trial is mandatory when the “verdict or judgment appears clearly contrary to the law and evidence.” According to the lower court, plaintiff has successfully argued that the evidence supports a new trial, as Drs. Anseman and Feldman, both treating physicians of plaintiff, related plaintiffs inju
 
 *1116
 
 ries to the January, 2005, accident. The court also noted the trial judge’s indication at the hearing on the motion for trial that he was “troubled” by the amount awarded for past medical expenses, and if he were free to interpret the evidence and do what he thought was fair, he would have granted plaintiffs motion on every count. Finding | iathat a fair interpretation of the evidence was exactly what is required, the appellate court concluded that the jury hi this instance failed in its responsibility and abused its discretion in the awards given to plaintiff.
 

 The court of appeal reasoned that, because the lower court abused its discretion in making an award, it was permitted to revise the award (without remand) to the extent of lowering it or raising it to the highest or lowest point which is reasonably within the discretion afforded to it. As such, the court of appeal reviewed other circuit decisions and, while confirming the jury’s finding of fault, amended the jury’s verdict to make the following awards: increased the award of past medical expenses from $40,000 to $98,272.32; increased the award for general damages from $10,000 to $150,000 for past and future physical and mental pain and suffering; and reversed the trial court’s denial of damages for loss of enjoyment of life and awarded $24,000 for that element of damages, past and future. Finally, finding the lower court erred declining to find Progressive arbitrary and capricious in its conduct, the court of appeal reversed the trial court’s denial of damages and awarded a penalty of $8,740.00 plus attorney fees and costs in the amount of $25,000.
 

 Defendant Progressive filed a writ application to this court, asserting the Third Circuit erred in increasing plaintiffs general and special damages awards, and further, the trial court did not abuse its discretion in denying plaintiffs motion for new trial, and the jury’s determination that Progressive was not arbitrary and capricious was correct. We granted the defendant’s writ application,
 
 Byron P. Guillory v. Jennifer D. Lee, et al.,
 
 09-C-075 (La.3/13/09), 5 So.3d 107, and after a thorough review of the record and applicable law, we find there was a reasonable factual basis in the record for the jury’s awards, and the court of appeal erroneously substituted its own judgment for that of the jury. As a result, the court of appeal Mincorrectly applied the appropriate standard of review to amend the jury’s awards in this instance. Furthermore, the court of appeal was in error in reversing the trial court’s denial of plaintiffs motion for new trial. For the reasons set forth below, we therefore reverse the court of appeal’s ruling and reinstate the jury’s verdict.
 

 Discussion
 

 It is well-settled that a judge or jury is given great discretion in its assessment of quantum, both general and special damages. Louisiana Civil Code article 2324.1 provides: “In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury.” Furthermore, the assessment of quantum, or the appropriate amount of damages, by a trial judge or jury is a determination of fact, one entitled to great deference on review.
 
 Wainwright v. Fontenot,
 
 00-0492, p. 6 (La.10/17/00), 774 So.2d 70, 74. This court has noted:
 

 [T]he reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon
 
 review,
 
 even though the appellate court may feel that its own evaluations and inferences are as reasonable. The rea
 
 *1117
 
 son for this well-settled principle of review is based not only upon the trial court’s better capacity to evaluate live witnesses (as compared with the appellate court’s access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.
 

 Perkins v. Entergy Corp.,
 
 00-1372 (La.3/23/01), 782 So.2d 606,
 
 reh’g denied,
 
 4/27/01 (quoting
 
 Canter v. Koehring,
 
 283 So.2d 716, 724 (La.1973))
 
 (superseded by statute on other
 
 grounds). Because the discretion vested in the trier of fact is so great, and even vast, an appellate court should rarely disturb an award on review.
 
 Youn v. Maritime Overseas Corp., et al.,
 
 623 So.2d 1257, 1261 (La.1993),
 
 reh’g denied,
 
 10/7/93.
 

 The role of an appellate court in reviewing a general damages award, one which may not be fixed with pecuniary exactitude, is not to decide what it considers | ir,to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. This court has long held true to the following principle:
 

 [b]efore a Court of Appeal can disturb an award made by a [factfinder,] the record must clearly reveal that the tiier of fact abused its discretion in making its award. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court.
 

 Wainwright,
 
 00-0492, p. 6, 774 So.2d at 74 (quoting
 
 Coco v. Winston Indus., Inc.,
 
 341 So.2d 332, 334 (La.1977) (internal citations omitted)).
 
 See also Miller v. LAMMICO,
 
 07-1352, p. 28 (La.1/16/08), 973 So.2d 693, 711 (stating that an appellate court may disturb a damages award only after an articulated analysis of the facts discloses an abuse of discretion and citing
 
 Theriot v. Allstate Ins. Co.,
 
 625 So.2d 1337, 1340 (La.1993));
 
 Youn v. Maritime Overseas Corp.,
 
 623 So.2d 1257, 1261 (La.1993);
 
 Reck v. Stevens,
 
 373 So.2d 498, 501 (La.1979). Furthermore, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.
 
 Rosell v. ESCO,
 
 549 So.2d 840, 044 (La.1989). Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong.
 
 Id.
 
 (citing
 
 Arceneaux v. Domingue,
 
 365 So. 2d 1330, 1333 (La.1978) and
 
 Watson v. State Farm Fire & Casualty Ins. Co.,
 
 469 So.2d 967 (La.1985)). Moreover, on review, an appellate court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently.
 
 Perkins,
 
 782 So.2d at 612 (citing
 
 Ambrose v. New Orleans Police Department Ambulance Service,
 
 93-3099, 93-3110, 93-3112, p. 8 (La.7/5/94), 639 So.2d 216, 221). Reasonable persons frequently disagree about the measure of damages in a particular 116case. “It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.”
 
 Youn,
 
 623 So.2d at 1261.
 

 Special damages are those which have a “ready market value,” such that the amount of damages theoretically may be determined with relative certainty, including medical expenses and lost wages.
 
 Kaiser v. Hardin,
 
 06-2092, p. 11 (La.4/11/07), 953 So.2d 802, 810 (per curiam) (citing
 
 McGee v. AC and S, Inc.,
 
 05-
 
 *1118
 
 1036 (La.7/10/06), 933 So.2d 770). An appellate court, in reviewing a jury’s factual conclusions with regard to special damages, must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court’s conclusions, and the finding must be clearly wrong.
 
 Kaiser,
 
 06-2092 at p. 11-12, 953 So.2d at 810 (citing
 
 Guillonj v. Ins. Co. of North America,
 
 96-1084 (La.4/8/97), 692 So.2d 1029).
 

 With these principles in mind, we must review the evidence in the record and determine if the jury’s special and general damages awards in this matter were contrary to the evidence contained in the record or constituted an abuse of discretion.
 

 Special Damages
 

 The record establishes plaintiff is a chronic pain patient, having first experienced neck pain as early as 1997. In April of 1997, the plaintiff reported to both Dr. Jerald Watts, M.D. and Dr. Luiz DeArau-jo, M.D., F.A.C.S. (“Dr. DeAraujo”) that he had a sudden onset of pain radiating to his left shoulder with weakness and numbness in his left hand, which continued for some time. As reported by Dr. Watts, a cervical MRI performed on June 13, 1997, showed a left disc herniation at C5-6, which was compatible with plaintiffs sensory findings, and Dr. Watts concluded the [17MRI might even include C6-7 nerve root involvement with parathesias into the dor-sum of the thumb and index fingers. A cervical CT post myelography scan on July 21, 1997, confirmed the findings of a disc protrusion at C5-6, as well as non-degenerative changes at C6-7. In August of 1997, Dr. Jack Hurst, M.D. recommended to Dr. Watts that plaintiff undergo a surgical discectomy, and on September 9, 1997, Dr. DeAraujo performed a microdiseecto-my at C5-6 on the left side of plaintiffs neck to repair the herniated disc. Plaintiff continued to see Dr. DeAraujo for followup appointments following the surgery, although his neck pain did not necessarily improve.
 

 In March, 2000, plaintiff began seeing Dr. Anseman for various complaints of pain, and continued to see Dr. Anseman both prior to and after this accident. Throughout 2000, plaintiff reported consistent pain in his neck, coupled with numbness and weakness of grip in both hands. Following complaints of pain in his lower back in late 2000, plaintiff underwent an MRI of his lumbar back, which was returned normal. In addition to pain medication, plaintiff began receiving trigger point injections to ease the pain in his neck and upper extremities, and continued to receive these injections periodically from that date forward.
 

 Throughout the fall of 2001, plaintiffs complaints of neck pain and numbness in his fingers remained consistent, and were accompanied by headaches, which Dr. Anseman attributed to plaintiffs “bruxism,” or grinding of the teeth. Dr. Anse-man recommended nerve conduction studies for plaintiffs carpal tunnel syndrome, and suggested that plaintiff visit Dr. James A. Pearce, D.D.S., for the problems plaintiff was experiencing with his jaw. Ultimately, plaintiff did not heed Dr. Anse-man’s advice and did not make an appointment to see Dr. Pearce at that time.
 

 In late 2001, Dr. Anseman’s reports noted “tension and stress” were “playing 118a huge part in neck and arm pain” in the plaintiff. Plaintiff also reported the injections he was receiving for his bilateral carpal tunnel syndrome were not successful, and consequently, on May 30, 2002, Dr. DeAraujo performed a carpal tunnel release on plaintiffs left hand. Plaintiff recovered well from the surgery, and reported consistent improvement to Dr. DeAraujo throughout 2002. In August of 2002, Dr. DeAraujo advised plaintiff to
 
 *1119
 
 return to his normal activities and to return to see him when he desired to have the carpal tunnel release performed on his right hand. Plaintiff ultimately did not undergo the release on his right hand.
 

 Plaintiff returned to see Dr. Anseman in September, 2002, with increased complaints of neck and left forearm pain, which worsened with tension, stress, or exertion. At this visit, plaintiff was prescribed the narcotic pain medication Lor-tab. Although plaintiff saw Dr. Anseman again in October, 2002, reporting improved range of motion and manageable pain with medicine, plaintiff continued to see Dr. Anseman several times in 2003, during which time he reported continuing flareups of neck pain, and some arm pain accompanied with pain and numbness around his wrists and hands when he over-exerted himself.
 
 [15]
 

 Plaintiffs first visit of 2004 with Dr. Anseman was on February 19, 2004, wherein the doctor’s records reflect plaintiff was under increased stress, as his wife 119was in a car accident. Although plaintiff reported his problems were under fairly good control during this visit, Dr. Anse-man did note plaintiffs neck was “very stiff,” and plaintiff reported occasional numbness of the left web space and index finger on his left hand as well as weakness in his right hand.
 
 [16]
 

 On September 22, 2004, plaintiff saw Dr. Phillip Lafleur for his depression related to his chronic pain. Dr. Lafleur’s notes indicate that not only was plaintiff dealing with his wife’s recent ear accident, plaintiff himself reported to Dr. Lafleur that he was in an accident “several years ago” and lives in chronic pain. Plaintiff had been taking Wellbutrin, and Dr. Lafleur increased plaintiffs dosage following .that initial visit.
 

 Plaintiff returned to see Dr. Anseman on October 26, 2004, wherein plaintiff reported he was doing “very poorly” since his last visit. He was having more difficulty with his pain in his neck and shoulder blades, having spasms in both of the inter-scapular areas, and missing large degrees in range of motion in his neck. In fact, Dr. Anseman specifically noted in his report: “this is the worst I have felt his neck.” Dr. Anseman gave plaintiff another prescription for Lortab and plaintiff received several trigger point injections in the left and right shoulder blade area between October and December of 2004.
 

 The record also reflects plaintiff also began a course of physical therapy at Med-
 
 *1120
 
 net Rehab, Inc., on October 28, 2004, and his last date of treatment at Mednet was December 17, 2004. However, plaintiff only met approximately thirty percent of the stated goals, thus appreciating little improvement in his cervical range of motion and only slightly lessened discomfort. The therapist noted plaintiff only | ¡^attended six (6) sessions between October 28, 2004, and December 17, 2004, and that the patient “would have seen more improvement with more regular attendance.”
 

 On January 14, 2005, plaintiff was involved in the motor vehicle accident that is the subject of the instant litigation. As mentioned previously, no injuries were reported to the investigating officer at the scene of the accident. Plaintiff did, however, visit his family doctor and friend, Dr. John Guidry, that afternoon, complaining of low back pain and left leg pain. Dr. Guidry diagnosed a “lumbar strain” and prescribed Flexeril, Mobic, and analgesic. Dr. Guidry’s notes from that visit do not reflect that plaintiff complained of any neck, arm or thumb pain.
 
 [17]
 

 Approximately one month after the accident, on February 15, 2005, plaintiff returned to see Dr. Anseman, reporting injury to the right hand in the area of the carpal-metacarpal joint of the right thumb, and increased numbness in the thumb, index finger and long finger of both hands. X-rays of the wrist and right hand, ordered by Dr. Anseman and performed on February 22, 2005, were reported as unremarkable. Plaintiff also complained of left arm pain, with constant pain in his neck and lower back at a level of 8.5 out of 10. Plaintiff reported having pain across the lower back on both the left and right side, radiating into the buttocks, and down the left leg to include the plantar surface of the left foot and the posterior thigh on the left. Plaintiffs range of motion was decreased from his last visit. Dr. Anseman recommended physical therapy,
 
 [18]
 
 as well as medications including Maxidone, |alSeroquel, and Lexapro. He also restricted plaintiff from lifting, pushing, or pulling anything greater than ten (10) pounds. Plaintiff received a trigger point injection at this visit, as well as on February 24, 2005, and March 7, 2005.
 

 In addition to the aforementioned x-rays on February 22, 2005, plaintiff underwent a lumbar MRI as well as an MRI of his cervical spine with and without contrast. The lumbar MRI showed mild degenerative (age-related) changes, but there was no evidence of an acute injury, nor was there any evidence of a disc herniation. The MRI of the cervical spine showed some minimal disc bulging at the C6-7 level as well as some mild posterior bone spurring. Dr. Anseman’s testimony at trial indicated that during his treatment of plaintiff following the accident in January of 2005, although he related the subsequent herniation of the C6-7 disc to the
 
 *1121
 
 subject accident, he never performed a comparison of plaintiffs previous MRIs, the most recent one having been conducted in 2000.
 
 [19]
 

 On April 1, 2005, Dr. Thomas H. Vree-land, M.D. performed a digital motion x-ray (“DMX”) on plaintiff, which examines the ligamentous structures of the neck. In sum, Dr. Anseman testified the results of plaintiffs DMX test showed plaintiff had ligament damage at C4-5 and C5-6.
 

 After seeing Dr. Anseman on April 25, 2005,
 
 [20]
 
 at which time plaintiff reported that his problems were moderately improved, on June 6, 2005, plaintiff reported to Dr. Anseman that he was about 25% improved and he was doing fairly well. He hadj^no weakness in his arms or legs. Thus, Dr. Anseman recommended plaintiff start swimming and that he begin a strength training program. At that time, plaintiff was averaging two Maxidone a day, Well-butrin, and Prevacid, and Librax from Dr. Person, who was treating plaintiff for his gastrointestinal issues.
 

 Plaintiff saw Dr. James A. Pearce, D.D.S., on August 15, 2005, for an evaluation related to plaintiffs chewing apparatus, designed to assist in the alleviation of plaintiffs TMJ pain. Plaintiff complained to Dr. Pearce of side mandibular pain and headaches in the temporal region of his head, left side auricular and perauricular pain which radiated into his face, and pain on both sides of his neck. Shortly after this visit, plaintiff returned to see Dr. Pearce on August 24, 2005, wherein plaintiff additionally complained of jaw popping. Plaintiff also had become aware of clinching or grinding his teeth at times, and reported trouble sleeping at night due to his neck and back pain.
 

 Dr. Pearce’s comprehensive report, completed shortly thereafter on September 7, 2005, confirmed his initial diagnosis that plaintiff suffered from a displaced disc of the left temporomandibular joint with bilateral TM joint capsulitis, causing arthral-gia of the TM joints. Moreover, Dr. Pearce noted plaintiff had bilateral coro-noid tendonitis, and parafunctional activity such as bruxism (grinding) resulting in increased hyperactivity. Dr. Pearce also specifically noted that excessive wear on the plaintiffs anterior teeth indicated a history of bruxism, or grinding. Plaintiff was prescribed splint therapy for a period of six to nine months.
 

 Also in September, 2005, plaintiff returned to see Dr. Anseman, reporting his lower back had not significantly changed, but he was experiencing a flare-up in his neck. Plaintiff was also experiencing spasms at this visit, and Dr. Anseman noted plaintiff was not doing the home exercises (soft skin rolling) that he had instructed hahim to do. Plaintiff also reported increased numbness down his arms, as well as in his thumb, index finger, and long finger. Dr. Anseman also specifically noted plaintiff still suffered from carpal tunnel syndrome.
 

 
 *1122
 
 Plaintiff experienced vast improvement later in 2005, which he reported to Dr. Anseman on October 18, 2005. More specifically, plaintiff stated his low back pain had greatly improved, his neck was at least 85% better, and he had returned to approximately 85% of his strength level prior to the accident. Moreover, plaintiff stated he had begun swimming and weight lifting. Dr. Anseman instructed plaintiff to continue taking Seroquel as needed for sleep, as well as Maxidone, Ativan, Well-butrin, Librax, and Prevacid.
 

 Plaintiffs progress, however, was short-lived. Not only was plaintiff involved in a subsequent minor car accident in November, 2005,
 
 [21]
 
 on February 21, 2006, plaintiff saw Dr. Anseman again and reported he “lost some ground” in his recovery due to significant strain in cleaning up his camp following Hurricane Rita in the fall of 2005.
 
 [22]
 
 Dr. Anseman reminded the plaintiff he cannot do the heavy lifting he was able to do before, as mechanical stress on his neck will cause his neck to flare up. Dr. Anseman also told plaintiff he was to be limited to a twenty pound weight restriction for the rest of his life. Plaintiff reported similar complaints to Dr. Anse-man at his visit in May, 2006.
 
 [23]
 

 |2,|⅛ August, 2006, plaintiff visited Dr. Anseman again, complaining of radicular pain down his left arm with neck pain and scapular pain bilaterally, and reporting that he was averaging three Maxidone a day, as well as taking aspirin. Dr. Anse-man’s notes reflect plaintiff had slightly depressed reflexes, with the suggestion that plaintiff consider taking Lyriea. Plaintiffs October visit with Dr. Anseman showed little improvement, as plaintiff reported increased pain in his neck, as well as pain in his left arm with numbness of the thumb, index and long fingers of the left hand. Dr. Anseman ordered a myelo-gram and post myelogram CT, and instructed plaintiff to continue taking the medication Lyriea, but also prescribed Av-inza and Lortab for pain.
 

 On November 3, 2006, plaintiff underwent the aforementioned prescribed procedures at Acadiana Imaging Center in Lafayette, Louisiana. Radiologist Dr. Vi-dyadhar Akkaraju, M.D., read the results and concluded the following: the cervical myelogram showed underfilling of the left C7 nerve root and mild underfilling of the right at C5-6. Further, the CT scan of the cervical spine with contrast post myelo-
 
 *1123
 
 gram showed a small focal disc herniation on the left at C6-7, and postoperative changes on the left at C5-6. Dr. Anse-man’s reports from November 13, 2006, reveal that he agreed with this interpretation of the images, stating plaintiff was symptomatic for the disc herniation at C6-
 
 rj
 

 [24]
 

 On February 5, 2007, the record reflects plaintiff had his final visit with Dr. | anAnseman.
 
 [25]
 
 During that visit, plaintiff was complaining “bitterly” of pain in his neck, which was at a constant level of six out of ten. Dr. Anseman’s notes indicate plaintiff was considering a neurosurgical approach, and Dr. Anseman suggested plaintiff obtain a surgical consultation. Plaintiff demonstrated a C7 weakness in both arms to include his triceps, wrist flexion and wrist external rotation. In addition to continuing pain medication, Dr. Anseman also instructed plaintiff to use intermittent cervical traction at home, although Dr. Anseman later testified that while the traction was important, it apparently was not providing the plaintiff any relief.
 
 [26]
 

 On March 21, 2007, plaintiff began seeing Dr. Arnold E. Feldman, M.D., whom he saw almost monthly until the time of trial.
 
 [27]
 
 Plaintiff initially presented to Dr. Feldman with the chief complaints of neck and right-sided arm pain. A CT cervical scan without contrast on March 21, 2007, showed narrowing of the canal at C5-6, and on March 26, 2007, a cervical MRI without contrast showed a bulging disc at C6-7. Dr. Feldman’s notes indicate that at his visits with the plaintiff on April 9, 20, May 15, June 13, and July 11, 2007, the plaintiff reported similar complaints of pain in the thoracic spine.
 

 Defendant Progressive Insurance Company requested an independent medical examination of plaintiff, which took place on July 20, 2007, and was performed by Dr. Vic Parmar, M.D. As they had been in the past, plaintiff’s chief complaints at this | gfjVisit were posterior neck pain with pain and tenderness in between his shoulder blades, which also affected plaintiffs right hand into the first and second fingers, along with numbness between first and second fingers of his right hand and weakness in his grip. Dr. Parmar’s conclusions included, among others, that plaintiff suffered from C6-7 radiculopathy on the right (indicating damage of the nerve root), and bilateral C-7 radiculopathy (nerve root on both the right and the left side was damaged). Dr. Parmar did note that the MRI from February, 2005, showed bone spur
 
 *1124
 
 ring at C5-6 and C6-7, but revealed no herniation.
 
 [28]
 
 Dr. Parmar’s recommendation was that because plaintiff had reached the optimal results from conservative treatment, if plaintiff elected surgery, he undergo a two level anterior cervical dis-kectomy from C5 to C7, along with fusion from C5 to C7.
 

 Plaintiff saw Dr. Feldman several more times throughout August as well as in September of 2007, at which time he performed a discogram on plaintiff. On October 3, 2007, Dr. Feldman performed a C5-6 discography with cervical discectomy on plaintiff. Plaintiff was required to wear a hard collar and refrain from lifting items over twenty pounds. On October 17, 2007, shortly before trial began on October 29, 2007, plaintiff underwent a cervical discography at C6-7 with cervical discectomy and anriuloplasty, also performed by Dr. Feldman.
 
 [29]
 

 It is well-settled that a tortfea-sor takes his victim as he finds him and when a defendant’s tortious conduct aggravates a pre-existing condition, the defendant must ^compensate the victim for the full extent of the aggravation.
 
 Lasha v. Olin Corp.,
 
 625 So.2d 1002, 1005-1006 (La.1993). The plaintiff, however, is required to establish a causal link between the tor-tious conduct and the aggravation of the preexisting condition. The test to determine if that burden has been met is whether the plaintiff proved through medical testimony that it is more likely than not that the subsequent injuries were caused by the accident.
 
 Maranto v. Goodyear Tire & Rubber Co.,
 
 94-2603 and 94-2615, p. 3 (La.2/20/95), 650 So.2d 757, 759. After our thorough review of the evidence contained in the record and applying the above-discussed principles as they relate to the vast discretion given to the finder of fact, we cannot say the jury erred in its special damage award to the plaintiff in this matter.
 

 The jury considered the abundance of testimony and documentary evidence set forth above. Given that evidence, the jury could have reasonably found that while plaintiff was involved in the subject accident, he suffered an aggravation of a preexisting injury which abated with time. More specifically, the jury could have reasonably concluded plaintiff was a chronic pain patient, and underwent a previous surgery as a result of neck pain since the mid-1990s which did not fully resolve his painful condition. In October, 2004, shortly before the subject accident, Dr. Anseman’s notes indicate plaintiffs neck was the “worst” he had seen it, and plaintiff did not benefit from the physical therapy at that time because he attended so few sessions. Dr. Anseman’s deposition testimony also indicated that even without any intervening trauma, it would be reasonable to expect plaintiff would have required medical supervision for his neck
 
 *1125
 
 and carpal tunnel symptoms, for the foreseeable future, based on the plaintiffs medical history. Further, plaintiff reported in October, 2005, approximately nine months following this accident, that he was 85% improved in terms of pain relief and strength recovery. The jury also considered plaintiffs l^involvement in intervening incidents following the subject accident, including his participation in the clean-up of his camp following Hurricane Rita, as well as the parking lot “bumper touch,” both occurring in the fall of 2005.
 

 Plaintiff also suffered from bilateral carpal tunnel syndrome, but only had a carpal tunnel release surgery on his left hand in 2002. Plaintiff elected not to undergo the carpal release surgery on his right hand, although plaintiff complained of consistent numbness and weakness in both hands pri- or to and after the subject accident, as verified by Dr. Anseman’s testimony. The record also establishes plaintiff was suffering from headaches and problems related to his bruxism, or grinding of his teeth, prior to this accident. Consequently, it was recommended to the plaintiff as early as 2001 that he see a dentist concerning his TMJ problems, a recommendation which plaintiff did not heed.
 

 Finally, contrary to the court of appeal’s conclusion, Dr. Feldman, one of plaintiffs treating physicians, even opined he could not state with full certainty that the subject accident absolutely did or did not cause the disc herniation upon which he performed surgery in October, 2007.
 
 [30]
 
 The jury was also entitled to consider the diagnostic tests performed on plaintiff and the interpretations of those tests by his treating physicians, which showed a bulging disc at C6-7 in February, 2005, but did not reveal herniation until late in 2006. In light of this evidence, and applying the appropriate standard, we find a reasonable factual basis exists for the jury’s awards |2i)Of $40,000 for past medical expenses and $10,000 for future medical expenses,
 
 [31]
 
 and the court of appeal erroneously substituted its own view of the evidence in amending those awards.
 

 General Damages
 

 As previously discussed, the jury awarded plaintiff $10,000 for physical and mental pain and suffering, past and future, and awarded zero for loss of enjoyment of life. Although the court of appeal found plaintiff suffered because of an increase in prescribed narcotic pain medication, our review of the record reflects plaintiff had been taking narcotic pain medication for quite some time. Also, the jury considered the live testimony of plain
 
 *1126
 
 tiff that he was worried about those things he was not being asked to do by his wife and daughter because of his condition. However, the jury felt an award of only $10,000 for physical and mental pain and suffering was appropriate, and moreover, that plaintiff did not sustain a loss of enjoyment of life. This court has held that loss of enjoyment of life “refers to detrimental alterations of the person’s life or lifestyle or the person’s inability to participate in the activities or pleasures of life that were formerly enjoyed prior to the injury.”
 
 McGee, et al. v. AC & S, Inc., et al.,
 
 05-CC-1036, p. 6 (La.7/10/06), 933 So.2d 770, 775. Because the jury is entitled to great deference in assigning quantum, an appellate court cannot disturb an award if two permissible views of the evidence exist. While we recognize the jury’s award is likely on the lower end of what is appropriate, it is not our role, nor the role of the court of appeal, to substitute our view of the evidence for that of the jury’s. Based Ispupon the evidence in the record, the jury could have reasonably concluded $10,000 was an appropriate general damages award, and thus, did not abuse its discretion in that regard. Consequently, the appellate court was in error in substituting its own judgment for that of the jury and adjusting the award.
 

 Arbitrary and Capricious Conduct of Progressive
 

 Despite plaintiffs allegation that Progressive was in bad faith in its failure to provide an unconditional tender, the jury found no arbitrary and capricious behavior on the part of the insurance company. The appellate court, as discussed above, reversed that finding, and awarded a penalty of $8,740.00 plus attorney fees and costs in the amount of $25,000.
 

 In order to establish a cause of action for penalties and/or attorney fees and costs under La. R.S. 22:658, a claimant must show that (1) an insurer has received satisfactory proof of loss, (2) the insurer failed to tender payment within thirty days of receipt thereof, and (3) the insurer’s failure to pay is arbitrary, capricious or without probable cause. La. R.S. 22:658.
 
 [32]
 

 See also, Louisiana Bag Co., Inc. v. Audubon Indent. Co.,
 
 08-453, p. 11 (La.12/2/08), 999 So.2d 1104, 1112-1113. Similarly, La. R.S. 22:1220 provides that an insurer owes to his insured a duty of good faith and fair dealing, which includes an affirmative duty to adjust claims fairly and promptly and to make a reasonable
 
 *1127
 
 effort to settle claims with the insured or the claimant, or both. An insurer who breaches those duties is liable for damages sustained as a result of that breach. The statute further provides that a breach includes “[flailing to pay the amount of any claim due any person insured by the contract within sixty (60) days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.” La. R.S. 22:1220.
 

 With regard to what constitutes “arbitrary, capricious, or without probable cause,” this court has held that the phrase is synonymous with “vexatious.”
 
 Reed v. State Farm Mut. Auto Ins. Co.,
 
 03-0107, p. 13-14 (La.10/21/03), 857 So.2d 1012, 1021 (citing
 
 Louisiana Maint. Serv.
 
 's,
 
 Inc. v. Certain Underwriters at Lloyd’s of London,
 
 616 So.2d 1250, 1253 (La.1993)). Furthermore, a “vexatious refusal to pay” means “unjustified, without reasonable or probable cause or excuse.”
 
 Reed,
 
 03-0107, p. 13-14, 857 So.2d at 1021. Both phrases describe an insurer whose willful refusal of a claim is not based on a good-faith defense.
 
 Id.
 

 This court has also stated that penalties should be imposed only when the facts “negate probable cause for nonpayment.”
 
 Louisiana Bag Co., Inc. v. Audubon Indent. Co.,
 
 08-453, p. 14 (La.12/2/08), 999 So.2d 1104, 1114 (citing
 
 Guillory v. Travelers Ins. Co.,
 
 294 So.2d 215, 217 (La.1974); Cra
 
 wford v. Al Smith P. & H. Serv., Inc.,
 
 352 So.2d 669, 673 (La.1977);
 
 McDill v. Utica Mut. Ins. Co.,
 
 475 So.2d 1085, 1092 (La.1985)). Moreover, whether or not a refusal to pay is arbitrary, capricious, or without probable cause depends on the facts known to the insurer at the time of its [¡^action, and this court has declined to assess penalties “when the insurer has a reasonable basis to defend the claim and acts in good-faith reliance on that defense.”
 
 Louisiana Bag Co.,
 
 08-453, p. 15, 999 So.2d 1104 at 1115 (citing
 
 Reed,
 
 857 So.2d at 1021). More specifically, not only are the statutory penalties inappropriate when the insurer has a reasonable basis to defend the claim and acts in good-faith reliance on that defense, especially when there is a reasonable and legitimate question as to the extent and causation of a claim, bad faith should not be inferred from an insurer’s failure to pay within the statutory time limits when such reasonable doubt exists.
 
 Reed,,
 
 857 So.2d at 1021 (citing
 
 Rudloff v. Louisiana Health Services and Indemnity Co.,
 
 385 So.2d 767, 771 (La.1980) (on reh’g); and
 
 Block v. St. Paul Fire & Marine Ins. Co.,
 
 32, 306, p. 8 (La.App. 2 Cir. 9/22/99), 742 So.2d 746, 752). An insurer who does not tender unconditionally a reasonable payment, a figure over which reasonable minds could not differ, will be subject to penalties and attorney’s fees.
 
 McDill v. Utica Mut. Ins. Co.,
 
 475 So.2d 1085 (La.1985). Finally, the question of arbitrary and capricious behavior is essentially a factual issue, and the trial court’s finding should not be disturbed on appeal absent manifest error.
 
 Reed,
 
 857 So.2d at 1021, citing
 
 Scott v. Insurance Company of North America,
 
 485 So.2d 50, 52 (La.1986).
 

 In this instance, plaintiff claims Progressive was arbitrary and capricious in its failure to make a second unconditional tender to the plaintiff. Our review of the record reveals that, following plaintiffs accident, on January 21, 2005, he sent a letter to both State Farm (the insurer of Jennifer Lee) and his own insurer (Progressive), indicating he sustained property damage and injuries caused by State Farm’s insured, and attached the police report with statements from both drivers. Shortly after Progressive received notice of the accident, Molly Prejean of Progressive took Lsplaintiffs recorded statement
 
 *1128
 
 of the accident, which was transcribed on May 18, 2006.
 
 [33]
 
 Although the record does not specifically indicate when, at some point following the accident, plaintiff received $5,000 from Progressive in medical payment coverage, the full limit contained within his policy.
 
 [34]
 

 The record does not reflect any correspondence or communication between plaintiff and Progressive until February 10, 2006, at which time plaintiff sent to Progressive the bills and reports of several doctors, including Drs. Anseman, Do-mingue, Vreeland, and Pearce, with the bills totaling $11,957.00. On February 17, 2006, Progressive sent a letter to plaintiffs attorney at the time, offering $5,020.00 in exchange for a full and final release of plaintiffs UM/UIM claim, which Progressive indicated was being made after a careful review of all the medical information obtained to date. Attorney for plaintiff responded to Progressive’s letter on February 22, 2006, stating his client was not in a position to settle his claim at that time, but that he is entitled to an unconditional tender under
 
 McDill v. Utica Mut. Ins. Co.,
 
 475 So.2d 1085, 1092 (La.1985). On that same date, February 22, Progressive sent another letter to plaintiffs attorney, enclosing an unconditional tender in the 134amount of $5,020, which Progressive identified as a tender “based on Progressive’s evaluation of your client’s claim to date.”
 

 On June 21, 2006, counsel for plaintiff sent a letter to counsel for Progressive, setting forth plaintiffs pre-existing neck conditions from 1997 to 2000, and summarizing the findings of the recent MRI and DMX imaging, which counsel stated evidenced new injuries resulting from the instant accident. Counsel also indicated plaintiff has been unable to participate in some of his hobbies since the accident. Counsel again asked for an unconditional
 
 McDill
 
 tender. Also in this letter, counsel for plaintiff requested counsel for Progressive contact him to discuss setting the depositions of Sally Jones, Jennifer Lee, and Amy Young.
 

 On April 17, 2007, shortly after Dr. Anseman sent Progressive his medical records for plaintiff, Progressive deposed Dr. Anseman, who testified the subject accident caused new injuries, herniation at C6-7, and other related problems. On June 5, 2007, Jennifer Lee, passenger Amy Young, and Sally Jones were deposed. On July 3, 2007, counsel for plaintiff sent correspondence to counsel for Progressive concerning some amendments to discovery
 
 *1129
 
 responses, as well as providing summaries and apparent inconsistencies of the recently taken depositions. Moreover, although counsel acknowledged the “relatively small”
 
 McDill
 
 tender received shortly after the accident, he requested another
 
 McDill
 
 tender. The letter indicated that failure to provide the tender within five days of receipt of the July 3 letter would result in plaintiffs amendment of his petition to allege arbitrary and capricious behavior on behalf of Progressive. Ms. Cic-cone’s testimony, to be discussed further below, indicates counsel for Progressive called counsel for plaintiff shortly following receipt of this letter to explain the concerns with causation and liability, and informing him that no tender could be made at that time.
 

 lasOn July 20, 2007, plaintiff underwent Progressive’s requested independent medical examination, performed by Dr. Vic Parmar, who testified the accident did not cause the disc herniation at C6-7. Shortly thereafter, on July 26, 2007, plaintiff amended his petition to add a bad faith claim against Progressive.
 
 [35]
 

 As previously mentioned, Kerry Ciccone was the claims representative at Progressive assigned to plaintiffs file, beginning in June or July of 2006. During her testimony at trial, she testified the reason another tender was not made to plaintiff was because of Progressive’s belief that there existed liability and causation issues. More specifically, Progressive’s review of the police report provided to it by the plaintiff included defendant Young’s written statement that a Cox Communications cable van swerved into her lane, causing her to strike plaintiffs vehicle. If that were the case, Progressive would owe no tender to plaintiff. Concerning the causation issues, Ms. Ciccone testified it was difficult to tell if plaintiff sustained any injury as a result of this accident, based upon his recorded statement that he had prior neck and back injuries, as well as the differing opinions of the physicians (Drs. Anseman and Parmar) whose reports she was provided throughout her evaluation.
 
 [36]
 
 Ms. Ciccone also testified there was little correspondence and reporting in the claims file from the date of the accident to December, 2005, because plaintiff had informed Progressive he wished to close his claim.
 

 Concerning the increase in Progressive’s reserves, Ms. Ciccone did confirm the reserves were increased periodically throughout this matter from $29,000 to $75,000 |Sfito $150,000 shortly before trial. However, she also testified the purpose of the reserves is a “worst case scenario,” and is based upon all information submitted by plaintiff to Progressive. Moreover, Progressive typically places the highest possible amount in reserves, to ensure that it is in compliance with the Department of Insurance. Furthermore, Ms. Ciccone testified the reserves that are set aside are not based upon an evaluation of the case and do not constitute authority
 
 *1130
 
 for settlement of the case.
 
 [37]
 

 Based upon our thorough review of the record, we cannot say Progressive’s actions rise to the level of arbitrary and capricious behavior that warrants an imposition of penalties and attorney fees in this matter. More specifically, as established above, Progressive possessed a good faith defense that there was a reasonable dispute concerning the extent of plaintiffs injuries resulting from the accident on January 14, 2005. Moreover, Progressive made an immediate tender of the $5,000 medical coverage payment, as well as a $5,020 unconditional tender in February, 2006, based upon its evaluation of plaintiffs case at that time. Although plaintiff sent various correspondence to counsel for Progressive in the two years following the accident, again, based upon the evidence establishing plaintiffs pre-existing complications with his neck with corresponding diagnostic tests that did not show a disc herniation until late in 2006, as well as the testimony of Ms. Ciccone establishing Progressive maintained a defense regarding causation, it cannot be said the jury committed manifest error in finding no arbitrary or capricious conduct on |S7behaIf of Progressive in this instance. The record does not reflect there was any “undisputed amount,” as contemplated by
 
 McDill,
 
 that Progressive was obligated to tender. Moreover, reasonable minds could have differed as to the value of plaintiffs claim, based upon the circumstances surrounding the cause of plaintiffs alleged injuries and related medical expenses, particularly the surgeries performed by Dr. Feldman in late 2007, which constituted a majority of plaintiffs medical bills.
 
 [38]
 
 Consequently, cognizant that when a statute authorizes the imposition of a penalty, it is to be strictly construed,
 
 [39]
 
 we find the jury could have reasonably concluded Progressive was not arbitrary and capricious in its actions, and thus, the appellate court was in error in reversing the jury’s decision and awarding penalties and attorney fees to plaintiff.
 
 [40]
 

 Motion for New Trial
 

 As previously discussed, the appellate court found the trial court erred in not
 
 *1131
 
 granting plaintiffs Motion for New Trial, stating the jury verdict was contrary to the evidence, as evidenced by the testimony of Drs. Feldman and Anseman, as well as the trial judge’s notation on the record that if he were in a position to grant the motion, he would have granted it on all counts. We disagree with the appellate court’s conclusion.
 

 | ssLouisiana Code of Civil article 1972 provides that a new trial shall be granted “[w]hen the verdict or judgment appears clearly contrary to the law and the evidence.” This court recently stated, however, that the jurisprudence interpreting article 1972 recognizes the trial court’s discretion in determining whether the evidence is contrary to the law and evidence.
 
 Martin v. Heritage Manor South Nursing Home,
 
 00-1023, p. 3 (La.4/3/01), 784 So.2d 627, 630. Even in light of this wide discretion of the trial court, that discretion is limited, as the trial court cannot freely interfere with any verdict with which it disagrees.
 
 Davis v. Wal-Mart Stores, Inc.,
 
 00-0445, p. 10 (La.11/28/00), 774 So.2d 84, 93. Furthermore, we stated:
 

 [t]he discretionary power to grant a new trial must be exercised with considerable caution, for a successful litigant is entitled to the benefits of a favorable jury verdict. Fact finding is in the province of the jury, and the trial court must not overstep its duty in overseeing the administration of justice and unnecessarily usurp the jury’s responsibility. A motion for new trial solely on the basis of being contrary to the evidence is directed squarely at the accuracy of the jury’s factual determinations and must be viewed in that light. Thus, the jury’s verdict should not be set aside if it is supportable by any fair interpretation of the evidence.
 

 Id.
 
 (citing
 
 Gibson v. Bossier City General Hospital, et al.,
 
 594 So.2d 1332 (La.App. 2 Cir.1991)). We have also stated the applicable standard of review in ruling on a motion for new trial is whether the trial court abused its discretion.
 

 With the aforementioned principles in mind, based upon our thorough review of the evidence in the record set forth above, it cannot be said the trial court abused its discretion denying the motion for new trial. While the trial court noted that, had it been in a position to do so, it would have granted the plaintiffs motion on all counts, it did state the jury was entitled to its own fair interpretation of the evidence. We find that, in this matter, the jury’s verdict is based upon a reasonable interpretation of the evidence in the record, and is not contrary to that evidence. |39Moreover, while we are aware of the delicate balance with which the appellate court is faced, namely, the great deference given to the jury in its fact finding role and the great discretion given to the trial court in deciding whether to grant a new trial,
 
 [41]
 
 we find that, in this instance, the court of appeal inappropriately substituted its interpretation of the evidence for that of the jury’s. As such, the appellate court was in error in reversing the trial court’s denial of a new trial.
 

 Decree
 

 For the foregoing reasons, we find the court of appeal was in error in amending the jury’s verdict to increase the award of past medical expenses from $40,000 to $98,272.32; increase the award for general damages from $10,000 to $150,000 for past and future physical and mental pain and suffering; and reverse the trial court’s denial of damages for loss of enjoyment of life to award $24,000 for that element of damages, past and future. We also find
 
 *1132
 
 the court of appeal erred in reversing the jury’s finding
 
 of
 
 no arbitrary and capricious conduct on the part of Progressive. Finally, we find the court of appeal erroneously reversed the trial court’s denial of plaintiffs motion for new trial. The judgment of the court of appeal is therefore reversed, and the jury’s verdict is reinstated in its entirety.
 

 REVERSED. JURY VERDICT REINSTATED.
 

 *
 

 Retired Judge Philip Ciaccio, assigned as Justice
 
 ad hoc,
 
 sitting for Justice Chet D. Traylor, now retired.
 

 [1]
 

 . Plaintiff maintained an auto insurance policy, including uninsured/underinsured motorist coverage, with Progressive Security Insurance Company, policy number 30626601-6, which was in effect from November 20, 2004, until May 20, 2005.
 

 [2]
 

 . The record is not clear as to the exact date upon which Progressive tendered this amount.
 

 [3]
 

 . On September 24, 2007, Cox Communications filed a Motion for Summary Judgment, asserting that the plaintiff could not produce factual support sufficient to establish that he would be able to satisfy his burden of proof against Cox. Plaintiff responded to Cox's Motion for Summary Judgment, asserting it only named Cox as a defendant out of an abundance of caution, and further, the doctrine of sudden emergency was first set forth in the instant litigation as an affirmative defense by Progressive. Consequently, plaintiff averred he had no first hand information that a Cox vehicle was in the area except for the testimony of defendant Lee and her passenger, Ms. Amy Young. Thus, plaintiff argued that the burden of showing that the emergency doctrine is applicable rests with Progressive, the party asserting the doctrine. Progressive also responded to the Motion for Summary Judgment, stating that material issues of fact regarding Cox’s negligence and whether defendant Lee is entitled to the benefit of the sudden emergency doctrine preclude summary judgment. On October 18, 2007, following a hearing, the trial court denied Cox's Motion for Summary judgment.
 

 [4]
 

 .At the conclusion of the presentation of the parties’ cases, the trial judge charged the jury. Specifically regarding deductions to be made from any award of damages the juiy may choose to provide to the plaintiff, the judge instructed the jury that it should not make any deductions from any amounts that the plaintiff had already received, as the court would make any necessary deductions.
 

 During its deliberations, the jury presented the judge with a hand-written question regarding health insurance. The judge called the juiy back into the courtroom and gave the following explanation to the jury's query:
 

 All right. Ladies and gentlemen, I — I brought you back in so that 1 could respond fully to the note that you sent out. I believe that we’ve solved some of the questions by sending in the exhibits. You will have to rely on the exhibits that we sent in and your memory of the testimony to answer all the questions that you have about what was or wasn't evidence in the case. There is a question about health insurance on the note. The existence of health insurance that might have covered some of the medical expenses incurred by the plaintiff is not admissible as evidence in the case. Should you find that Mr. Guillory incurred medical expenses that were related to this accident, you should award those expenses that you find related, making no deduction for any health insurance that may have existed because it is just not admissible. It is what we call the collateral source rule. Okay. Ladies and gentlemen, you’ll go back to the deliberation room and continue your deliberation.
 

 [5]
 

 . Acts 2008, No. 415, § 1, eff. Jan. 1, 2009, renumbered La. R.S. 22:658 to La. R.S. 22:1892. By the same Act, La. R.S. 22:1220 was renumbered to La. R.S. 22:1973. However, because plaintiff's cause of action under these statutes arose under the previous statute numbers, those will be utilized throughout this opinion.
 

 It should be noted, however, that throughout this matter, plaintiff has asserted that the 2006 version of La. R.S. 22:658 applies to his cause of action, which provides that a penalty of 50% of the difference between the amount tendered and the amount owed, plus attorney’s fees, are due in the event of a failure to pay the amount due an insured within thirty days after receipt of satisfactory proof of loss.
 

 [6]
 

 . Plaintiff argued, among other assertions, that Progressive was arbitrary and capricious in failing to make another tender, in light of Progressive’s assertion that it considered causation to be an issue in this case. Plaintiff states that Progressive evaluated this case as 100% defendant Lee's fault. This is evidenced by Progressive's filing of a lawsuit against Lee and State Farm on January 10, 2006, which never included Cox Communications as a defendant. Thus, according to plaintiff, had Progressive truly evaluated this case as one in which Cox had some degree of fault, it could have filed a cross claim against Cox in this case seeking to recover the $5,000 in medical payments. Plaintiff points out that Progressive chose not to pursue that course of action.
 

 It is important to note, however, that Progressive dismissed the lawsuit against Cox shortly thereafter on August 8, 2006.
 

 [7]
 

 . At the hearing on December 17, 2006, the trial judge indicated in his oral reasons that he disagreed with the jury's verdict, most specifically with its award of past medical expenses. He also noted that had he been given the power to do so, he would have granted the plaintiff's motion on all counts. However, the judge correctly recognized he was not allowed to disturb the jury’s award'in this instance, as they made an award based upon their interpretation of tire evidence.
 

 [8]
 

 . The court of appeal noted, however, that plaintiff did not brief the JNOV issue and therefore, considered it abandoned.
 

 [9]
 

 . In
 
 Abshire,
 
 the Third Circuit found an injured driver, who had a pre-existing neck injury, was entitled to recover medical expenses from surgery that the jury had found was not related to the accident that was the subject of the litigation. As such, the court increased the jury's award to cover those expenses, as well as amending the jury's general damages award to $150,000.
 

 [10]
 

 . Although it is not clear from the record, it appears dtat plaintiff's wife's car accident occurred at some point in late 2003 or early 2004.
 

 [11]
 

 . The court of appeal also found plaintiff’s request for a second tender was a "modest one,” and agreed with and adopted the calculation set forth in plaintiff's Motion for JNOV (half of the $75,000 reserves as set in mid-2007, or $37,500, subject to a $20,020 credit, for a total of $17,480.00). Thus, the court found, Progressive was arbitrary and capricious in failing to make a second tender in this matter.
 

 [12]
 

 .The appellate court found significant the fact that Progressive dismissed its lawsuit against Lee and State Farm in August, 2006, ten months before the depositions took place in June, 2007. The court of appeal noted that the testimony in those depositions confirmed the fault of Jennifer Lee, as Lee testified that the Cox van may not have crossed over into her lane at all (contrary to her statement given at the scene of the accident, in which she stated that the Cox van came "all the way over” into her lane).
 

 [13]
 

 . Prior to 2006, La. R.S. 22:658 set forth a penalty of twenty-five percent.
 

 [14]
 

 . Specifically, the court of appeal relied on the following language in this court's
 
 Sher
 
 decision:
 

 Here, although an insurer has continuing duty of good faith and fair dealing which extends throughout the litigation period, the claim first arose prior to the amendment of R.S. 22:658. Because the duty is a continuing one, had plaintiff not first made satisfactory proof of loss prior to the amendment of R.S. 22:658, his petition for damages served after the amendment became effective could have served as satisfactory proof, thereby triggering the time period set forth in the statute and could have subjected Lafayette to the penalties contained in the amendment because the claim would have first arisen after the amendment.
 
 Further, again because the duty is a continuing one, had plaintiff made satisfactory proof of loss prior to the amendment and had Lafayette paid that claim, and had plaintiff discovered new damage and made satisfactory proof which Lafayette failed to pay within the time period contained in the statute, but after the amendment became effective, Lafayette could have been subject to the penalties contained in the amendment because the claim would have arisen after the effective date of the amendment.
 
 Neither of those situations is the case here — the claim for the penalties contained within the statute arose prior to the effective date of the amendment. Plaintiff’s argument that Lafayette’s continuing breach of the duty of good faith and fair dealing made it subject to the increased penalties contained in the amended version of R.S. 22:658 is without merit.
 

 Sher v. Lafayette Ins. Co.,
 
 07-2441, 07-2443, at p. 14-15, 988 So.2d at 199 (emphasis supplied).
 

 [15]
 

 . In May, 2003, plaintiff reported to Dr. Anseman continued "flare-ups” in his neck about two times a week, which were usually related to exertional activity. Plaintiff denied any arm pain during the flare-ups. Plaintiff also complained of bilateral carpal tunnel syndrome symptoms, with the right being greater than the left. Plaintiff was still taking Lortab and Ativan daily for pain. Although plaintiff was having a spasm during this particular office visit, his condition, as noted by Dr. Anseman in his report, was about the same as the February visit. Dr. Anseman also gave plaintiff a prescription for a home traction unit to alleviate his neck pain.
 

 On July 15, 2003, at the suggestion of Dr. Anseman, plaintiff saw Dr. Daniel C. Dunlap, M.D., as plaintiff was experiencing a tremor in his hands, particularly after exertion or excess nervous tension. After a review of plaintiffs medical history, including previous surgery, chronic neck spasms, and sinus issues, Dr. Dunlap ruled out Parkinson’s disease. However, he recommended plaintiff see neurologist Dr. Jay Rao, as plaintiff's intermittent hand tremor was difficult to characterize, labeling it a "physiological tremor.” The record does not indicate that plaintiff ever made an appointment to see Dr. Rao.
 

 [16]
 

 . Dr. Anseman testified during his deposition that plaintiff's numbness in his hands was not a new symptom following the January, 2005, accident; plaintiff experienced numbness in both hands prior to the accident.
 

 [17]
 

 . On February 6, 2005, plaintiff visited Dr. John Feerick, D.D.S., whose testimony indicated that plaintiff saw him for many years for his general dentistry needs, as well as plaintiffs prior TMJ problems resulting from stress and grinding of his teeth. Prior to this accident, Dr. Feerick had provided plaintiff a soft splint to prevent the interference with the bruxism and provide some relief from the TMJ issues.
 

 Dr. Feerick also testified as to his personal friendship with the plaintiff, which included maintaining a camp in Johnson Bayou near plaintiff’s camp, as well as traveling to Las Vegas with plaintiff and his wife following the accident.
 

 [18]
 

 . Plaintiff attended physical therapy from February 22, 2005, until June 3, 2005, at Mednet Rehab, Inc. He attended twenty-two sessions total, with four “no-shows” and two cancelled visits. His response to therapy, according to the therapist's notes, was "fair.”
 

 [19]
 

 . Although nerve conduction tests performed on plaintiffs upper extremities by Dr. James N. Domingue, M.D., on March 14, 2005, were normal, at plaintiff's next visit with Dr. Anseman on March 24, 2005, Dr. Anseman recommended that plaintiff visit an orthopaedic surgeon for his right thumb. Furthermore, although plaintiff reported having increased weakness in his right arm, he stated his pain level had dropped to a five or six out of ten, and his range of motion had improved some. According to Dr. Anseman's notes, plaintiff did, however, have weakness in his triceps, wrist flexor and wrist external rotator.
 

 [20]
 

 . Plaintiff reported he was able (o resume his course of physical therapy, but was still experiencing numbness in his thumb and index fingers on both hands.
 

 [21]
 

 . Plaintiff's testimony at trial indicates that he “touched bumpers” with someone in the parking lot of his building in November, 2005. He reported no injuries as a result of this incident, nor did he claim any property damage to his truck. The other car involved, however, sustained approximately $3,400 in damage.
 

 [22]
 

 . Dr. Feerick’s testimony contradicts Dr. Anseman's notes that indicate plaintiff experienced "significant strain” cleaning up his camp following the Hurricane. Dr. Feerick testified that following Rita, he and a few others traveled to their camps to survey the damage. Having just had surgery himself, Dr. Feerick stated both he and plaintiff did nothing other than walk around and point their fingers.
 

 [23]
 

 .Also in May, 2006, plaintiff saw Dr. Reginald Ardoin, M.D., at Louisiana Pain Management, at the request of Dr. John Martin, M.D. Although plaintiff reported pain at the time of that visit, Dr. Ardoin was unable to detect any significant atrophy in either upper extremity, although he stated there may be minimal atrophy in the left hand muscles. He also reviewed plaintiff's MRI of his lumbar spine that was taken in February, 2005, which he concluded had no significant pathology other than mild age related changes of posterior elements. His review of the MRI of the cervical spine taken at the same time revealed multilevel spondylosis with additional findings of C4-5 facet hypertrophy bilaterally, un-covertebral spurring bilaterally at C5-6, and mild posterior spurring with slight disc bulge at C6-7.
 

 [24]
 

 . In his last visit of the year with Dr. Anse-man, on November 16, 2006, plaintiff reported that his pain, while constant in neck and both arms, had not worsened but neither had it improved. Plaintiff was demonstrating mild weakness in his left triceps and wrist flexor, and continued pain and numbness in his thumb, index and long finger, left more so than right.
 

 [25]
 

 . Dr. Anseman’s deposition testimony indicated that plaintiff had reached the maximum dosage of pain medication that Dr. Anseman was qualified to prescribe in his medical experience and specialty. Thus, he recommended that plaintiff seek alternative methods of relief, which included seeing a pain anesthesiologist.
 

 [26]
 

 . On February 9, 2007, plaintiff saw Dr. Olga E. Reavill, M.D., a pain management specialist. Following her consultation and examination of plaintiff, Dr. Reavill recommended that plaintiff would benefit from a series of cervical epidural steroid injections, as well as a series of cervical and thoraci facet blocks.
 

 [27]
 

 . Dr. Feldman’s deposition testimony indicates that during his treatment of plaintiff, he did not have any prior records other than those provided to him by Dr. Anseman and the history provided to him by plaintiff.
 

 [28]
 

 . Dr. Pamiar testified in his deposition that the MRI is the "gold standard” in diagnosing vertebral disk injuries for those individuals who have not had surgery previously, and the CT myelogram is the equivalent "gold standard” for those individuals who had undergone surgery. Because plaintiff had not undergone any previous surgery on the C6-7 level, if plaintiff had a disc herniation at that level in February, 2005, it would have appeared on the MRI at that time. However, the disc herniation at C6-7 did not appear on any of plaintiff's diagnostic images until November, 2006. This led Dr. Parmar to conclude that the actual herniation of that disc occurred somewhere between February, 2005, and November, 2006.
 

 [29]
 

 . During his deposition, Dr. Feldman could not confirm that plaintiff's condition was caused 100% by the subject accident. He stated that his opinion was based on several things, one of which is the patient's account of what he believes to be the cause.
 

 [30]
 

 . Dr. Feldman's testimony indicated that he takes a patient’s word as it is provided to him. Specifically, he stated:
 

 .... And so it goes back to, do I believe Mr. Guillory? Yes. Does the jury believe Mr. Guillory? They’re going to have to make that decision. But I can't tell you that this accident absolutely caused 100 percent of his problems, nor can I tell you that it did not cause his problems. So my — my opinion is based on a number of things, one of which on day one, September 21st, is the patient telling me what he believes to be the cause.
 

 [31]
 

 . We are cognizant of the principle that the testimony of a treating physician is to be provided more weight than that of a non-treating physician, and the jury was correctly charged in this matter in that respect. Although Dr. Anseman, one of plaintiff’s treating physicians, opined that this accident absolutely caused the disc herniation at C6-7, Dr. Feldman, also a physician that treated plaintiff for several months, opined that he could not absolutely conclude that all of plaintiff's problems were related to this accident. Thus, the jury was entitled to consider the testimony of both physicians with equal weight, and it appears that they did not believe that the bulk of plaintiff's alleged injuries and related expenses were a result of the January, 2005, accident.
 

 [32]
 

 . La. R.S. 22:658 (2005) provided, in pertinent part:
 

 (A)(1) All insurers issuing any type of contract, other than those specified in La. R.S. 22:656, R.S. 22:657, and Chapter 10 of Title 23 of the Louisiana Revised Statutes of 1950, shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest.
 

 [[Image here]]
 

 (B)(1) Failure to make such payment within thirty days after receipt of such satisfactory proofs and demand therefor or failure to make a written offer to settle any property damage claim, including a third-party claim, within thirty days after receipt of satisfactory proofs of loss of that claim, as provided in Paragraphs (A)(1) and (4) respectively, or failure to make such payment within thirty days after written agreement or settlement as provided in Paragraph (A)(2), when such failure is found to be arbitrary', capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of twenty-live percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or to any of said employees, or in the event a partial payment or tender has been made, twenty-five percent of the difference between the amount paid or tendered and the amount found to be due.
 

 [33]
 

 . During plaintiff's recorded statement, taken not long after Progressive was put on notice of the claim, plaintiff indicated that he had prior neck and back injuries, his neck and lower back were “bothering him,” and his hand was swollen, but identified no other injuries during the interview.
 

 [34]
 

 . As previously discussed, plaintiff asserts that Progressive’s bad faith is demonstrated by the circumstances surrounding its filing of a lawsuit against defendant Lee and State Farm on January 10, 2006, to recover the $5,000 medical payment to plaintiff Guillory, alleging Lee to be solely at fault for the accident. Progressive answered plaintiff's lawsuit on April 27, 2006, and later amended its answer on May 10, 2006, to assert the sudden emergency doctrine, and stating that a third party for whom Progressive was not responsible was the cause of the accident. Shortly thereafter, Progressive dismissed its lawsuit against Lee and State Farm on August 8, 2006.
 

 We disagree that this evidences Progressive's bad faith. Progressive's claim representative, Ms. Kerry Ciccone, testified at trial that the lawsuit was filed as a "rush” suit in order to honor the statute of limitations, in order to protect any right Progressive may have had to recover the $5,000 medical coverage payment made to plaintiff. There is no indication in the record that Progressive's filing of this lawsuit was based upon a failure to investigate factual claims, as plaintiff asserts.
 

 [35]
 

 . The final correspondence in the record from counsel for plaintiff to counsel for Progressive was dated September 7, 2007, in which counsel included Dr. Feldman's bill for treatment of plaintiff in the amount of $16,000 as well as Dr. Feldman's diagnostic notes. Counsel also asked that in the event tire matter did not settle in the near future, he be provided dates to depose Dr. Parmar, Dr. Feldman, and a representative of Progressive with regard to the bad faith claim.
 

 [36]
 

 . Ms. Ciccone also testified that she did not receive Dr. Feldman's records for his treatment of plaintiff until two days before her testimony at trial. Thus, Ms. Ciccone disputed that “satisfactory proof of loss” was received timely.
 

 [37]
 

 . This characterization of Progressive’s reserves fay Ms. Ciccone is similar to one that the fourth circuit discussed in
 
 Molony v. USAA Property and Casualty Ins. Co.,
 
 97-CA-1836, p. 13-14 (La.App. 4th Cir.3/4/98), 708 So.2d 1220, 1226. In
 
 Molony,
 
 the court held that an insurance company’s "reserve” does not mean "the amount over which reasonable minds could not differ,” which is what
 
 McDill
 
 requires. The court declined to equate "reserve” with "undisputed amount.” Morever, the reasonableness of an insurance company's tender is not gauged by simply comparing it with its reserves, but is determined on a consideration of the facts known to the insurer prior to trial and whether reasonable minds could not differ on the amount that is due in light of those facts.
 

 [38]
 

 . Contrary to the appellate court's finding, we do not find that Progressive’s delay in scheduling depositions or transcribing the statements of various parties constituted arbitrary and capricious behavior. Furthermore, the appellate court’s reliance on
 
 McClendon v. Economy Fire & Cas. Ins. Co.,
 
 98-1537 (La.App. 3 Cir. 4/7/99), 732 So.2d 727 was misplaced, as the insurer in the
 
 McClendon
 
 matter took
 
 no
 
 substantive action within fourteen days after notification of the loss. In this matter, Progressive took substantive action, including tendering $5,000 in medical payment coverage, taking plaintiff's statement a short time after the accident, as well as tendering $5,020 based upon its evaluation of the plaintiff’s case.
 

 [39]
 

 .
 
 International Harvester Credit Corp. v. Scale,
 
 518 So.2d 1039, 1041 (La.1988) (internal citations omitted).
 

 [40]
 

 . Because we find that the jury could have reasonably concluded that Progressive was not arbitrary and capricious in its conduct, we do not reach the issue of whether the 2005 or 2006 version of La. R.S. 22:658 applies in this instance.
 

 [41]
 

 .
 
 Davis,
 
 00-0445 at 11, 774 So.2d at 93.