NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

12-1339

JERRL L. THOMPSON

VERSUS

HARALAMPOS  RIZOS, ET AL.

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. 2008-11322-K
HONORABLE PATRICK LOUIS MICHOT, DISTRICT JUDGE

**********

JOHN E. CONERY
JUDGE

**********

Court composed of Sylvia R. Cooks, James T. Genovese, and John E. Conery, Judges.

AFFIRMED.

Terry Eli Theriot
Attorney at Law
Post Office Box 2234
Lafayette, Louisiana 70502
(337) 266-6073
COUNSEL FOR PLAINTIFF/APPELLANT:
    Jerrl L. Thompson

**Charles Collins Garrison**
**Caffery, Oubre, Campbell & Garrison**
**Post Office Drawer 12410**
**New Iberia, Louisiana 70562-2410**
**(337) 364-1816**
**COUNSEL FOR DEFENDANT/APPELLEE:**
**Louisiana Farm Bureau Casualty Ins. Co.**

**Alex Andrew Lopresto, III**
**Jeansonne & Remondet**
**Post Office Box 91530**
**Lafayette, Louisiana 70509-1530**
**(337) 237-4370**
**COUNSEL FOR DEFENDANT/APPELLEE:**
**Haralampos Rizos**
**Home State Country Mutual Ins. Co.**

**CONERY, Judge.**

In this personal injury suit, Plaintiff, Jerrl L. Thompson, seeks review of a jury verdict which he alleges was inadequate. For the following reasons we affirm.

### FACTS AND PROCEDURAL HISTORY

On January 8, 2008, Mr. Thompson was driving his pick-up truck northbound on Highway 1121, and Mr. Rizos was driving his eighteen wheeler tractor-trailer southbound on Highway 13. Due to construction on Highway 13, Highway 1121 was being utilized as a temporary bypass. When he made his turn onto Highway 1121, the tire on the trailer portion of Mr. Rizos' eighteen-wheeler caught Mr. Thompson's pickup truck on the front left side. It is undisputed that the accident occurred in the curve of the roadway, just past the intersection. Defendant's vehicle, travelling at a speed of approximately five miles per hour, sideswiped Plaintiff's vehicle.

As a result of the accident, Mr. Thompson claimed he sustained a "horrifying" injury to his right knee, which will require knee replacement. He also claimed injury to his neck, requiring multiple ongoing cervical injections. Mr. Thompson brought suit against Mr. Rizos, his employer, Drake P&D, LLC, and their insurer, Home State Country Mutual Ins. Co., for property damage, personal injuries and related medical expenses both past and future.

Mr. Thompson filed a motion for summary judgment on the issues of negligence and insurance coverage, which was granted by the trial court on July 11, 2011. The trial court found Mr. Rizos one hundred percent at fault in causing the accident. The trial court also found Mr. Rizos was acting in the course and scope of his employment with defendant Drake, therefore Home State's policy provided coverage for the accident. Defendants did not appeal the issue of fault, and on May

23, 2012, the remaining issues of causation, the nature and extent of the injuries and damages were tried by jury. The jury returned the following verdict:

## JURY VERDICT FORM

**INTERROGATORY NO. 1:**

Do you find by a preponderance of the evidence that Jerrl L. Thompson was injured and his vehicle damaged as a result of the January 8, 2008 accident?

Yes _____x_____ No_____

If your answer is "Yes," go to Interrogatory No. 2. If your answer is "No," date and sign this form in the space identified and give it to the bailiff.

**INTERROGATORY NO. 2:**

What amount, in dollars and cents, will compensate Jerrl Thompson for the injuries sustained as a result of the January 8, 2008 accident? You may or may not find that Jerrl L. Thompson suffered any damages in one or more of the following categories, but each blank must be filled in, either with a dollar amount, or with a "0" if you find no damages for a particular category:

(1)  pain, suffering and disability; physical and mental,
         (past, present, and future)                    $ 15,000.00

(2)   loss of enjoyment of life                          $   -0-

(3)  past medical expenses                               $  1,000.00

(4)  future medical expenses                             $   -0-

(5)  property damage                                     $   500.00

2

## ASSIGNMENT OF ERROR

Mr. Thompson claims the jury erred and abused its discretion in awarding a totally inadequate verdict in this case.[1] In the alternative, he asks for a remand to the trial court for a new trial.[2]

## LAW AND DISCUSSION

"[A]ppellate jurisdiction of a court of appeal extends to law and facts." La.Const. art. 5, § 10(B). Our supreme court, in *Ryan v. Zurich American Insurance. Co.*, 07-2312, p. 7 (La. 7/1/08), 988 So.2d 214, 219, reiterated the standard of review for facts as follows:

> The jury's determination of the amount, if any, of an award of damages . . . is a finding of fact. The Civil Code provides that "[i]n the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury." La. C.C. art. 2324.1.
>
> The standard of review of a jury's findings is well-settled:
>
> A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Our supreme court set forth a two-part test for the reversal of a factfinder's determinations: (1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).

*Cole v. Allstate Ins. Co.,* 07-1046 (La.App. 3 Cir. 6/05/08), 987 So.2d 310, *writ denied*, 08-1463 (La. 10/31/08), 994 So.2d 535 (citing *Earls v. McDowell*, 07-17 (La.App. 5 Cir. 5/15/07), 960 So.2d 242).

"Whether an accident caused a person's injuries is a question of fact which

---

[1] Appellant did not brief the jury's failure to award damages for future medical costs, including surgery for Mr. Thompson's foot deformity, or the jury's failure to award any damages for loss of enjoyment of life, thus we will consider them abandoned. Uniform Rules—Courts of Appeal, Rule 2–12.4

[2] Plaintiff did not seek a Judgment Not Withstanding the Verdict nor did he file a Motion for a New Trial at the trial court level. This court does not have the authority to grant the additur of $250,000.00 requested. La.Code Civ.P. art. 1814.

3

should not be reversed on appeal absent manifest error." *Housley v. Cerise*, 579 So.2d 973, 979 (La.1991) (*citing Mart v. Hill,* 505 So.2d 1120 (La.1987)).  As this court stated in *Bernard v. Hartford Insurance Co.*, 09-71 (La.App. 3 Cir. 6//3/09), 12 So.3d 1098, 1100-01, *writ denied*, 09-1524 (La. 10/9/09), 18 So.3d 1285 (quoting *Sportsman Store of Lake Charles, Inc. v. Sonitrol Sec. Sys. of Calcasieu, Inc.,* 99-201, p. 6 (La.App. 3 Cir. 10/19/99), 748 So.2d 417, 421):

> It is well settled that a court of appeal may not set aside a finding of fact by a trial court or a jury in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. *Lirette v. State Farm Ins. Co.,* 563 So.2d 850, 852 (La.1990); *Rosell v. ESCO,* 549 So.2d 840, 844 (La.1989); *Arceneaux v. Domingue,* 365 So.2d 1330, 1333 (La.1978); *Canter v. Koehring Co.,* 283 So.2d 716, 724 (La.1973). The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. *Lirette v. State Farm Ins. Co.,*[563 So.2d] at 853; *Sistler v. Liberty Mutual Ins. Co.,* 558 So.2d 1106 (La.1990).

The panel in *Bernard,* 12 So.3d at 1102 (quoting *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989)), further stated:

> When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the fact-finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.

"It is clear that a defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct." *Lasha v. Olin Corp.*, 625 So.2d 1002, 1005 (La.1993).  Further, Louisiana jurisprudence is clear: when a person was in good health prior to the accident and symptoms appear after the accident, that person's injuries are presumed to have resulted from the accident. *Bernard,* 12 So.3d 1098.

4

The trial court found Mr. Rizos one hundred percent at fault for the accident. Therefore, the jury had to decide first, whether the accident in January 2008 was the cause of the claimed property damage to Mr. Thompson's 1996 Dodge Ram pickup truck; and second, whether the physical injuries to Mr. Thompson's right knee and neck were caused by the collision. Additionally, if the accident was the cause or partial cause of the claimed injuries, the jury then had to determine the amount of money necessary to compensate Mr. Thompson for his pain and suffering (past, present, and future), the amount of past medical expenses associated with the accident, and any future medical expenses anticipated and associated with the accident.

The principal contention between the parties is medical causation. An appellate review of the issues is based on the jury's factual findings based upon the evidence presented, as well as their evaluation of the credibility of the witnesses, including the expert medical testimony presented by both parties. *Rosell*, 549 So.2d 840. "Because the discretion vested in the trier of fact is so great, and even vast, an appellate court should rarely disturb an award on review." *Guillory v. Lee,* 09-75 (La. 6/26/09), 16 So.3d 1104, 1117 (citing *Youn v. Mar. Overseas Corp.*, 623 So.2d 1257 (La.1993)).

Mr. Thompson does not dispute his long history of medical problems relating not only to his right knee but also to his neck. He has undergone three surgeries on his right knee, beginning when he was a teenager in the 1960s and continuing with two additional surgeries in the late 1970s. He was involved in three automobile accidents, one in 1989 and two in the 1990s which resulted in injuries to his neck. In addition, he has also had surgery for a broken right ankle as well as ongoing problems with surgery on his left ankle. After the surgery on

5

his left ankle, he continued to seek medical attention for the left ankle from 1984 until 2003. Mr. Thompson testified at trial he was in good health and pain free from 2003 until the January 8, 2008 accident, which he claims caused his prior conditions to again become problematic.

Defendants contend the jury was correct in its determination that the property damage to Mr. Thompson's pickup truck, as well as the claimed injuries to Mr. Thompson's right knee and neck, were not as severe as claimed by Mr. Thompson. Accordingly, the jury resolved any conflict in the testimony against the plaintiff.

**Property Damage**

Mr. Thompson testified that his 1996 Dodge Ram truck had significant damage caused by the negligence of Mr. Rizos. He claimed damage to the left front fender, the left front wheel rim, the radiator, the air conditioner, the front windshield, the iron cow catcher, the ABS light, and the airbag light. He presented an estimate totaling $5,312.90 to repair the damages to his twelve-year-old pickup truck. Mr. Thompson testified, however, that he did not have the repairs made to the truck by the mechanic who prepared the damage estimate. Instead, he had the repairs made in a piecemeal fashion over a period of time due to the failure of Home State to reply to his demands for repair to the vehicle.

The failure of Home State to comply with Mr. Thompson's request for repairs was due, in part, to the lack of documentation of the damage to the pickup. Mr. Thompson's nephew arrived at the scene of the accident in order to document the damage to the pickup and took a number of photographs. Some photographs were introduced into evidence at trial, but none of them showed damage to Mr. Thompson's pickup truck on January 8, 2008, the date of the accident. The record

6

does not contain any visual documentation to support the damages claimed by Mr. Thompson. There are no photographs of the left front fender which was the point of impact.

Although available, Mr. Thompson's nephew did not testify. Likewise, Mr. Thompson's guest passenger, also available to testify, was not called as a witness. Thus, despite the availability of these witnesses, Mr. Thompson failed to offer any testimony to corroborate the alleged damages to his pickup truck.

In contrast to Mr. Thompson's uncorroborated testimony about the damage to his pickup truck, Defendants presented the testimony of Officer Gregory Dobbins. Officer Dobbins, an eleven-year veteran with the Louisiana State Police with significant experience in accident investigation, confirmed the undisputed fact that this collision happened at approximately five miles per hour and was a sideswiping type of accident in which the front left fender of Mr. Thompson's pickup truck came into contact with the right rear tire of Mr. Rizos' trailer.

When questioned about the damage to both vehicles, Officer Dobbins testified there was no damage to Mr. Rizos' tractor/trailer. He testified the only visible damage on the pickup were "scuff marks" on the left quarter panel caused by contact with the tires of the trailer. Officer Dobbins saw no other damage to the pickup truck. In the absence of any apparent damages or injuries, Officer Dobbins was not required by state police regulations to take any photographs of the accident and did not do so.[3]

The lack of evidence in support of Mr. Thompson's claim for $5,312.90 in repairs to his 1996 Dodge Ram pickup truck was evident to the jury. The $5,312.90

---

[3] The absence of the physical injuries claimed by Mr. Thompson will be addressed separately below.

estimate was made by a mechanic who did not complete the repair work on Mr. Thompson's vehicle. Only Mr. Thompson's testimony was offered to prove damages to his vehicle.

Although contemporaneous photographs were taken at the scene of the accident and submitted into evidence, not one depicted the actual damage to the pickup truck. Two witnesses, Mr. Thompson's nephew, who took the photographs, and the guest passenger in Mr. Thompson's pickup truck, were available but were never called to testify about the damage to the pickup truck. Thus, it is presumed that their testimony would have been adverse to the plaintiff. *Driscoll v. Stucker*, 04-589 (La. 1/19/05), 893 So.2d 32.

The testimony of Officer Dobbins clearly contradicts Mr. Thompson's testimony. His conclusions are supported by his years of experience, the facts of the accident, and his determination that no damages or injuries occurred which required him to take photographs pursuant to state police regulations. The testimony presented clearly supports the jury's determination that the claimed damages were not related to the accident on January 8, 2008. The jury's award of $500.00 for the "scuff marks" on Mr. Thompson's 1996 Dodge Ram pickup truck, which were made by the trailer tires, was not manifestly erroneous and will not be disturbed on appeal.

**The Knee Injury**

Mr. Thompson testified he was generally in good health before the accident, but suffered a "horrifying injury" to his right knee as a result of the accident.

It is undisputed that Mr. Thompson has a long history of surgeries, including three on his right knee. In 1966, as a teenager, he underwent surgery to remove the meniscus, which is the cushioning in his right knee. The second surgery

8

occurred in 1978, when he tore the anterior cruciate ligament in his right knee and underwent reconstructive surgery. The reconstruction on his right knee failed and was repeated in 1979. Mr. Thompson has also undergone surgery on other parts of his lower extremities, including a fractured hip, and an injured right ankle in the 1980s. He later suffered an unfortunate accident in 1984 which required surgery to his left ankle by Dr. John Cobb. As a result, Mr. Thompson was disabled until 2003.

On January 11, 2008, three days after the accident, Mr. Thompson visited Dr. Mark Dawson, a general practitioner and coroner for Acadia Parish, complaining of knee and neck pain. Dr. Dawson testified he has been Mr. Thompson's doctor for many years, and he treated him on a monthly basis from 1984 until 2003 for pain and instability in his left ankle after the surgery by Dr. Cobb. Dr. Dawson testified that the instability of the left ankle put stress on Mr. Thompson's right leg and knee.

Dr. Dawson attempted to treat Mr. Thompson conservatively, but eventually referred him back to his former treating surgeon, Dr. Cobb. Dr. Dawson related both the knee and neck pain Mr. Thompson was experiencing to the accident of January 8, 2008.

Dr. Cobb continued to treat Mr. Thompson for both his knee and neck until Dr. Cobb's death in 2011. After his death, Dr. John Sledge continued Dr. Cobb's course of treatment. Both physicians attributed the need for right knee replacement surgery to the accident on January 8, 2008.

In contrast to the conclusions of Mr. Thompson's three treating physicians, Dr. Stan Foster, a practicing orthopedist with the Acadiana Orthopedic Group, evaluated Mr. Thompson on behalf of Defendants. He testified Mr. Thompson's

9

need for knee replacement surgery was not related to the accident of January 8, 2008. In Dr. Foster's expert medical opinion, Mr. Thompson's anterior cruciate ligament repair in the 1970's caused significant instability. He opined this instability accelerated the deterioration in Mr. Thompson's right knee, leading to long term degeneration and osteoarthritis. Dr. Foster testified that Mr. Thompson would need a total knee replacement even if the accident of 2008 had never occurred.

Dr. Foster further testified the need for knee replacement surgery was not due to any acute tear caused by the accident. In support of his conclusion, Dr. Foster indicated if there had been an acute tear in the anterior cruciate ligament at the time of the accident, Mr. Thompson would have experienced severe pain and would have had trouble walking. The record reflects when Officer Dobbins asked Mr. Thompson if he was injured, he responded, "No." In addition, Officer Dobbins testified Mr. Thompson did not appear to be having any trouble walking during his investigation of the accident. He also testified the vehicles were moved from the roadway to an underpass during that investigation. Dr. Foster's testimony that the accident did not cause a tear in the anterior cruciate ligament was in stark contrast to Dr. Sledge's testimony that the accident caused the tearing of the anterior cruciate ligament repair work done in the 1970s.

It is evident from the record there was conflicting expert testimony regarding causation between Mr. Thompson's medical experts, Drs. Dawson, Cobb and Sledge, and Defendants' medical expert, Dr. Foster. The jury, after hearing all of the medical experts, awarded no damages for future medical expenses. The jury's role was to determine whether Mr. Thompson was entitled to damages for future

10

knee surgery caused by the January 8, 2008 accident, and what amount, if any, to award him for his pain and suffering for the alleged injury to his right knee.

The trial court correctly instructed the jury that it could place greater weight on the testimony of Mr. Thompson's treating physicians over that of any expert who examined the plaintiff only once for evaluation purposes. *Morgan v. Belanger*, 633 So.2d 173 (La.App. 3 Cir. 1993), *writ denied*, 93-3121 (La. 2/11/94), 634 So.2d 832. The jury clearly gave greater weight to the testimony of Dr. Foster than Mr. Thompson's treating physicians. The weight the jurors give to the testimony of a witness, particularly when it pertains to a finding of credibility, should not be disturbed on appeal. *Rosell*, 549 So.2d 840. In addition, the trier of fact's vast discretion in determining damages should rarely be disturbed on appeal. *Youn,* 623 So.2d 1257.

The record supports the jury's conclusion that the need for a total knee replacement was due to previous surgeries and degeneration of the right knee over a number of years and not the result of the January 8, 2008 accident. We find the jury's factual determinations are not manifestly erroneous and, therefore, will not be disturbed on appeal.

**The Neck Injury**

Mr. Thompson also claimed that he sustained a cervical injury as a result of the accident. Once again, however, the facts of the accident, a sideswipe with both vehicles traveling at approximately five miles per hour, are not consistent with the severe injuries claimed by Mr. Thompson. The relatively minor sideswipe, coupled with Mr. Thompson's past medical history and lack of credibility were considered by the jury.

11

It is undisputed that Mr. Thompson was involved in three accidents in the 1990s in which he suffered an injury to his neck. Mr. Thompson's past injuries were so severe that in 1996, Dr. Cobb recommended surgery due to his continued neck problems. Dr. Cobb's recommendation of surgery was based on a diagnosis of spondylosis, arthritis, and nerve related symptoms which were causing Mr. Thompson continued discomfort and pain. Although it was recommended by Dr. Cobb, Mr. Thompson never had surgery on his neck. Dr. Sledge testified the neck injury was the result of a "whiplash" Mr. Thompson received in the accident. As with the claimed injury to the right knee, Mr. Thompson's doctors all opined that he needed cervical injections to his neck and continued medical treatment in the future as a result of the January 2008 accident.

However, Dr. Foster also examined Mr. Thompson's neck and found no cervical paraspinal muscle spams or any nerve root impingement. Dr. Foster also evaluated Mr. Thompson's MRI done on February 11, 2009, and reviewed his x-rays. Dr. Foster testified that, in his opinion, the neck complaints were due to a progression of the spondylosis and degenerative arthritis diagnosed by Dr. Cobb in the 1990s, as well as the natural aging process. He recommended conservative treatment with medication for the treatment of arthritis and found no need for surgery. Other than the pre-existing spondylosis and arthritis, Dr. Foster found Mr. Thompson's neck to be within normal limits.

Mr. Thompson told Dr. Foster that he was pain free in his neck for at least twelve years before this accident happened. On cross examination, Dr. Foster admitted a person can have arthritis which is asymptomatic and then an automobile accident can aggravate the arthritis and cause pain. Mr. Thompson claims Dr. Foster agreed that he "needed further epidural injections in his neck." Dr. Foster's

testimony, however, was that he did not disagree with the recommendation of Drs. Cobb and Sledge that Mr. Thompson undergo cervical injections in his neck. However, his ultimate opinion remained unchanged, that Mr. Thompson's neck condition was related to his extensive arthritic condition and not to the January 2008 accident.

The jury was once again presented with conflicting testimony regarding the neck problems Mr. Thompson claimed were the result of the accident. Dr. Sledge's testimony concerning "whiplash" is not consistent with the relatively minor sideswipe nature of the accident. In light of Mr. Thompson's pre-existing conditions, it was reasonable for the jury to find that any injury to Mr. Thompson's neck was minimal, at best, and did not require treatment beyond the initial conservative treatment he received. Therefore, the jury's determination relating to Mr. Thompson's alleged neck injury as a result of this accident was not manifestly erroneous. Therefore, the award of no damages for future medical treatment will not be disturbed on appeal.

**Foot Deformity**

Almost four years after the January 8, 2008 accident, Mr. Thompson scheduled two appointments with a podiatrist, Dr. Lon Baronne.[4] During his first appointment with Dr. Baronne, Mr. Thompson did not disclose his extensive prior medical history. Based on the incomplete medical history disclosed by Mr. Thompson, Dr. Baronne, on his initial examination, related the foot deformity, hallux valgus, to the accident on January 8, 2008. He initially attributed the foot deformity post-accident to the alteration in Mr. Thompson's gait due to the injury

---

[4] Mr. Thompson did not raise the issue on appeal of the jury's failure to make an award for his foot deformity; however it was briefed on appeal by the defendants to demonstrate plaintiff's lack of credibility.

to his right knee. He recommended surgery to correct the deformity at a cost of $10,000.00 to $12,000.00.

The video deposition of Dr. Baronne was placed into evidence by Defendants. This tactic was primarily utilized to challenge the credibility of Mr. Thompson's testimony concerning the foot deformity. Defendants argue that Mr. Thompsons's failure to provide Dr. Baronne with a complete medical history as to the foot problem underscores the lack of credibility in Mr. Thompson's other testimony in which he tried to relate the injuries to his right knee and neck to the January accident.

Despite his extensive medical history, which included multiple surgeries on his lower extremities, and a diagnosis in the 1990s by Dr. Cobb of hallux valgus, Mr. Thompson's initial medical history to Dr. Baronne was abbreviated to the following:

> This patient had an accident and was injured on the right side. His knee was a problem, and he had difficulty walking and his big toe crossed over severely after the accident within two months. He states Dr. Cobb told him to wear a larger shoe and his gait pattern, along with the injury, was making his foot worse.

After initial questioning by Mr. Thompson's counsel, wherein a portion of Mr. Thompson's medical history was discussed with Dr. Baronne, the doctor still related the foot deformity to the accident. His conclusion was based on Mr. Thompson's claim that his foot deformity had become worse within two months of the January 8, 2008 accident.

Dr. Baronne's conclusion about the cause of the foot deformity changed completely during his examination by counsel for the defendants. Counsel for Defendants initially questioned Dr. Baronne about the etiology and development of hallux valgus. After giving a detailed explanation of the development of the foot

14

deformity, Dr. Baronne was informed of the true medical history of Mr. Thompson, which included the documented medical records of Dr. Cobb, who in the 1990s diagnosed and recommended treatment for Mr. Thompson for hallux valgus.

Upon learning of Mr. Thompson's extensive medical history, including Dr. Cobb's diagnosis, Dr. Baronne's opinion on the causal link between the accident of January 8, 2008, and the development of Mr. Thompson's foot deformity changed dramatically. Dr. Baronne then testified the foot deformity he observed when he first examined Mr. Thompson was more likely the result of a progression of that condition over a long period of time that preceded the 2008 accident.

Mr. Thompson's lack of credibility, along with the facts of the accident, and his longstanding previous medical conditions, more than adequately supported the jury's determination that the need for any future medical treatment was not caused or related to the January 8, 2008 accident. Thus, the jury's determination that no future medical damages were owed by Defendants was not manifestly erroneous and will not be disturbed on appeal.

**Damages**

The jury was instructed to determine property damage causation, medical causation, and damages. In so doing they were the judges of the facts and credibility of all witnesses, including Mr. Thompson, Officer Dobbins, and the medical experts who testified at trial. The jury could reasonably determine that although the driver of the eighteen-wheeler, Mr. Rizos, was found one hundred percent at fault for this low speed, minimal impact, sideswipe accident, the accident was not the cause of Mr. Thompson's alleged past and future medical expenses for his right knee, his neck, or his foot deformity. The jury could also reasonably conclude there was no basis for the extensive property damage sought

15

for the minimal "scuff mark" property damage to Mr. Thompson's 1996 Dodge Ram truck.

The jury awarded Mr. Thompson $15,000.00 for past, present, and future pain and suffering. In his closing argument to the jury, defense counsel suggested any award made to Mr. Thompson should be minimal. He then stated: "Now. What is a minimal amount? It is for you to decide. Five thousand ($5,000), ten thousand ($10,000), is that minimal? You know, twenty thousand ($20,000)? I don't know. It could be." Accordingly, the jury's award of $15,000.00, though generous, reflects the jury's conclusion of the minimal nature of Mr. Thompson's past, present, and future pain and suffering. This determination was based on the facts of the accident, expert medical testimony, and the jury's determination of the credibility of Mr. Thompson. These same factors support the jury's award of only $1,000.00 for past medical expenses and the lack of any award for future medical expenses, as well as the award of $500.00 for the claim of property damage to Mr. Thompson's vehicle.

## CONCLUSION

We therefore affirm the verdict of the jury, finding no manifest error. All costs of these proceedings are to be paid by Jerrl L. Thompson.

**AFFIRMED.**