NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

CA 17-742

CRYSTAL R. MOFFETT AND MARCUS D. MOFFETT

VERSUS

MICHAEL LYONS, ET AL.

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 80484
HONORABLE LORI ANN LANDRY, DISTRICT JUDGE

**********

D. KENT SAVOIE
JUDGE

**********

Court composed of Sylvia R. Cooks, Billy Howard Ezell, and D. Kent Savoie, Judges.

AFFIRMED AS AMENDED

**Bart J. Hebert**
**J. Brent Barry**
**Boyer & Hebert, LLC**
**401 E. Mills Avenue**
**Breaux Bridge, LA 70517**
**(337) 332-0616**
**COUNSEL FOR PLAINTIFFS/APPELLANTS:**
   **Crystal R. Moffett**
   **Marcus D. Moffett**

**David R. Rabalais**
**The Dill Firm**
**825 Lafayette Street**
**Lafayette, LA 70502**
**(337) 261-1408**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
   **Michael Lyons**
   **Houston Specialty Ins. Co.**
   **Shannon Gaspard Trucking, LLC**

**SAVOIE, Judge.**

In this case arising out of an auto accident, Plaintiffs appeal seeking an increase in the jury's award of damages. For the following reasons, we affirm the jury's award as amended.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 24, 2012, Crystal Moffett was travelling westbound on I-10 in St. Martin Parish. At that time Defendant, Michael Lyons, who was driving an 18-wheeler truck, was also traveling westbound on I-10. Mr. Lyons drove the truck from the right lane into the left lane, causing Mrs. Moffett to enter the median. Mrs. Moffett's vehicle sustained $190 worth of damage due to being side-swiped by the truck. However, the nature and severity of what occurred during and after she entered the median was disputed at trial, and there was conflicting evidence in the record.

Specifically, a medical report from Mrs. Moffett's treating physician, Dr. Joseph Bozzelle, dated August 3, 2012, reflects that "[t]he trailer of the 18-wheeler side-swiped her ever so slightly because the patient jerked to avoid impact." At trial, Mrs. Moffett described the accident as follows:

> As [Mr. Lyons] got onto the interstate, I yielded to him and got behind him. He got on and I switched into the left lane because I knew it was going to take him a while to pick up speed. As I was travelling in the left lane, he started to pass me up and then he just cut me off. I had nowhere else to go. I took my steering wheel, I jerked it, and I swerved into the median. In the median I bounced around. It was rough. On the ground there were ruts. And I remember slamming on the brakes. I came to a complete stop. I panicked because I almost lost my life. I had nowhere to go. If I wouldn't have swerved, I would have been killed.

Mrs. Moffett further explained that after she came to a stop in the median she got back onto the interstate and continued after Mr. Lyons. While driving, she

called 911 and explained that she had been run off the road. She caught up with Mr. Lyons and gave the 911 dispatcher the license plate number and the name of trucking company on Mr. Lyons' truck. Mrs. Moffett testified she told the dispatcher she could continue to follow Mr. Lyons but the dispatcher advised her not to do so.

On cross-examination, Mrs. Moffett's agreed that she had stated the following during her deposition:

> and without notice he just came into my lane, and to avoid – he made some contact with me, and for him to avoid making more contact with me, I took the steering wheel and swerved off the interstate and onto the grassy area of the median. And I got back on, and he did not stop after making contact with me.

Mrs. Moffett further admitted on cross-examination that in her deposition, she did not mention almost being killed, bouncing or bumping in the median, coming to a complete stop before getting back onto the interstate, or jerking the steering wheel.

Mrs. Moffett alleges that, as a result of the July 2012 accident, she incurred injuries to her wrists, neck, ankle, and low back.

At the time of the July 2012 accident, Mrs. Moffett was also receiving treatment for injuries she sustained in a prior accident that occurred on October 11, 2011. Mrs. Moffett testified that the October 2011 accident happened at approximately 10:00 p.m. wherein her vehicle was rear-ended by another vehicle, and she hit her head and struck her left knee on the steering wheel. She went to the emergency room at St. Martin Hospital within twelve hours of the accident, complaining of tingling on the left side of her body and pain in her head, neck, left shoulder, right arm, left knee, foot, and lower back.

Following the October 2011 accident, Mrs. Moffett received medical treatment related to bilateral neck pain, bilateral low back pain, head pain, tingling in her hands, and shoulder pain going across both shoulders, her shoulder blades, and upper trapezius. Dr. Bozzelle was her primary treating physician. In the course of her treatment, she received massage therapy, two medial branch blocks in her cervical spine at the C-3, C-4, C-5, and C-6 levels,[1] and a cervical radiofrequency ablation (RFA) at the right C-3, C-4, C-5, and C-6 levels.[2] She also was referred to Dr. Louis Blanda for carpal tunnel surgery and underwent the surgery for her right and left wrists. At the time of the July 2012 accident, Mrs. Moffett was on medical leave from work due to her recovery from the left carpal tunnel surgery on May 30, 2012.

Following the July 2012 accident, Mrs. Moffett first sought treatment on August 3, 2012, from Dr. Bozzelle, complaining of bilateral neck, shoulder, wrist, elbow, and ankle pain. She continued treatment under Dr. Bozzelle's care, including massage and physical therapy, an MRI of her cervical spine, a cervical epidural injection, and an EMG and nerve conduction study of her bilateral upper extremities.

She also continued to see Dr. Blanda for follow up concerning her carpal tunnel surgeries and was released to light duty work per Dr. Blanda's medical record dated September 18, 2012. She was fully released per Dr. Blanda's record dated November 20, 2012. She was employed as a full-time paralegal at a law firm making fifteen dollars per hour.

---

[1] Dr. Bozzelle explained that this is a diagnostic procedure for suspected facet joint problems, wherein the nerves that go into the facet joints are blocked, and the effect on the patient's pain is measured.

[2] Dr. Bozzelle explained that this is a procedure that involves burning the affected nerves.

Thereafter, Dr. Bozzelle referred Mrs. Moffett to Dr. Blanda for a surgical consultation pertaining to her cervical spine. Dr. Bozzelle testified that he referred Mrs. Moffett to Dr. Blanda after an MRI of her cervical spine on September 5, 2012, in his opinion, showed two disc herniations, one at C-4,5 and one at C-5,6, and a November 2, 2012 EMG and nerve conduction study showed, in his opinion, a three-level radiculopathy. Therefore, he initially diagnosed Mrs. Moffett with a left-sided herniated disc causing radiculopathy at C-5, C-6, and C,7. During trial, however, he stated that in retrospect, his initial opinion as to C-5 was "overzealous."

Dr. Blanda testified that he recommended Mrs. Moffett for the cervical surgery following his physical examination of her and review of her MRIs and EMGs. Due to a noted inconsistency in her pre-surgery MRI and the one ordered by Dr. Bozzelle following the July 2012 accident, Dr. Blanda ordered a discogram, which indicated that Mrs. Moffett had an annular tear in her cervical disc. Mrs. Moffett ultimately underwent a cervical surgical procedure called an anterior cervical discectomy and fusion with instrumentation in connection with her C-5,6 disc on July 22, 2013 ("the cervical surgery").

Mrs. Moffett and her husband filed suit on July 22, 2013, against Mr. Lyons, as well as Shannon Gaspard Trucking, LLC and Houston Specialty Insurance Company. Mr. Lyons' fault was not at issue in this case. A jury trial on the issue of damages was held April 26-29, 2016. During the course of trial, Mrs. Moffett submitted medical bills she had incurred since the July 2012 accident totaling $117,963.22, which included over $75,000 related to the cervical surgery.

On April 29, 2016, the jury returned a verdict in favor of Mrs. Moffett awarding her a total of $40,000 in damages as follows: $11,500 for past medical;

4

$23,000 for past, present, and future physical pain and suffering; $3,000 for lost wages; and $2,500 for physical disability.

Plaintiffs filed a motion for JNOV, and an alternative motion for new trial or additur on June 3, 2016. In its written reasons for denying Plaintiffs' motions, the trial court stated:

> While plaintiffs presented competent evidence that Mrs. Moffett's cervical surgery was related to the [July 24, 2012] accident at hand, evidence was also presented to the jury suggesting that Mrs. Moffett's surgical intervention was unrelated to this 2012 accident. Evidence was also presented that Mrs. Moffett was in a subsequent accident that she failed to disclose to her medical providers.
>
> . . . . At the time of the accident at issue, Mrs. Moffett was treating for injuries resulting from another accident. There was testimony that Mrs. Moffett was "mostly healed" and other testimony that she was still experiencing symptoms from an October 2011 accident. There was also testimony that suggested that Mrs. Moffett did not have an injury requiring surgery at all.
>
> This [c]ourt feels the jury heard testimony to support their award set forth in the verdict form. As such, the [c]ourt is prohibited from interfering with the conclusions of the jury.

The trial court denied Plaintiffs' motions on August 8, 2016. Thereafter, Plaintiffs appealed and assert the following assignments of error:

1. The jury abused its discretion by awarding only $2,500.00 in damages for Crystal Moffett's physical disability.

2. The jury's award of damages to Crystal Moffett of only $3,000 in past lost wages was manifestly erroneous.

3. The jury's award of less than the total amount of medical expenses Crystal Moffett incurred after the accident was manifestly erroneous.

4. The jury clearly abused its discretion in awarding Crystal Moffett only $23,000.00 in past, present and future physical pain and suffering.

5. The District Court committed legal error by allowing Defense Expert, Dr. Charles Aprill, to testify on issues related to the mechanism of Crystal Moffett's injuries.

5

## DR. APRILL'S TESTIMONY

We first consider Plaintiffs' fifth assignment of error wherein they argue that the trial court impermissibly allowed Defendants' expert, Dr. Charles Aprill, to testify "on issues related to the mechanism" of Mrs. Moffett's injuries, and therefore we should disregard his testimony and conduct a *de novo* review. Defendants called Dr. Aprill as an expert in radiology to testify as to the causation of the injuries necessitating Mrs. Moffett's cervical surgery.

> The standard of review for evidentiary rulings of a trial court is abuse of discretion. If a trial court has committed error in its evidentiary rulings such that the jury verdict is tainted by the errors, the appellate court should conduct a *de novo* review.
>
> In *Evans* [*v. Lungrin*, 97-541, 97-577 (La.2/6/98), 708 So.2d 731, 735] the supreme court stated: "Legal errors are prejudicial when they materially affect the outcome and deprive a party of substantial rights." *Evans*, 708 So.2d at 735. Under *Evans*, a *de novo* review . . . should be limited to "consequential errors," which are errors that "prejudiced or tainted the verdict rendered."
>
> If we determine that a *de novo* review is not required here, we must review the jury's findings under the manifest error/clearly wrong standard of review which provides that a court of appeal may not set aside a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong."

*Vaughn v. Progressive Sec. Inc. Co.*, 03-1105, p. 3 (La.App. 3 Cir. 3/2/05), 896 So.2d 1207, 1213 (La.App. 3 Cir. 3/2/05).

Prior to trial, Plaintiffs sought a motion seeking to exclude Dr. Aprill "from providing testimony at trial regarding his opinion concerning the mechanics of any motor vehicle accident or mechanism of injury resulting therefrom, and any other force-of-impact testimony[.][3] On April 5, 2016, the trial judge signed an order granting the motion and stating:

---

[3] In Plaintiff's motion in limine, they take issue with Dr. Aprill's expert report wherein he stated

It is of the opinion of this [c]ourt that Dr. Charles Aprill's opinions regarding accident reconstruction, mechanics, or impact testimony & all other testimony that goes b/y the scope set by law . . .go beyond his expertise and beyond what is permissible for experts in his field. Dr. Aprill's testimony shall be limited to the field in which he is accepted as an expert[.]

At trial, Dr. Aprill was accepted as an expert in radiology with a special expertise in the evaluation of adult spine disorders. He testified that in forming his opinions, he reviewed the emergency room report following the October 2011 accident and Mrs. Moffett's medical records that were provided to him regarding her treatment in 2011 – 2014.

On appeal, Mrs. Moffett argues that "despite the plaintiffs' continued objections the [trial judge] allowed Dr. Aprill to offer testimony on the mechanism of injury for a prior accident and the July 2012 accident. This testimony caused substantial harm to the plaintiffs' case as illustrated by the jury's inconsistent damage awards[.]" Plaintiffs ask us to disregard Dr. Aprill's testimony because the trial judge's "erroneous admission of Dr. Aprill's testimony on the mechanics of injury substantially impacted the case."

Specifically, Plaintiffs take issue with Dr. Aprill's statement that "[t]he accident in 2011 was a rear-end collision that's called a rapid acceleration moment of force." They note their counsel's objection as to foundation and the fact that "it's a biomechanic opinion." Thereafter, the trial court stated that Dr. Aprill could testify as "what [his] findings were, how [he] compared it to what the medical reports were. [He] can tell him - - how that impacts [his] ability to make a decision.

It is more likely than not that the initial accident of 11/1/11 [sic], a rapid acceleration mechanism or injury, caused derangement of the C5/6 disc. . . . The second incident . . . does not actually involve any major impact, no rapid acceleration or deceleration moments, based on her description. This is not the type of incident that would typically result in significant injury to a normal cervical disc or facet joints.

7

The history does matter, but I don't need you to give us any attempt to recount how that happened."

Mrs. Moffett also takes issue with the following testimony of Dr. Aprill that was given immediately after the trial court's above-mentioned statement:

> A.  [The October 2011 accident] was a rear-end collision. This is a common and sufficient cause of neck pain of injury to facets and discs or facets or discs. The day the following the [2011] accident she came to the hospital, she had severe neck pain, severe limited motion. It was clear that something significant had happened to her neck. She had X-rays and the X-rays showed a reversal of the normal curve of the neck. This implies increased muscle tension, which she did have according to medical records. So something serious had happened to her neck. It was likely that something was injured. There were no fractures or dislocations so this was one of the so-called soft tissue or lesser injuries, like a facet joint injury or a discal injury. . . . There were 80 some odd massage therapy visits before the – 2012 accident. . . . When I looked at the pain drawings . . . it was obvious that Ms. Moffett was having neck pain initially worse going to the left, then later, during Dr. Bozzelle's treatment, greater on the right. But it was actually bilaterally most of the time, it was just sometimes greater left, sometimes greater right.
>
> If you injure the facet joints on the right side it induces right sided pain. There's no crossover. . . . It can't be that she injured facets on both sides or the pain would have been both sides all the time. But if you injure a central structure, the end of her tibial disc, . . . pain can refer to either side and it often refers to one side and then the other side, changes back and forth. So I suspect she had a discal injury with the first accident.

Following this testimony, Plaintiffs' counsel objected on the grounds of improper foundation, and the trial court overruled the objection stating "he's given us his opinion based on all of the information he has received. You'll have the opportunity to cross-examine him. The foundation has been sufficiently laid."

Plaintiffs also note in their brief the following statement by Dr. Aprill regarding the July 2012 accident: "The mechanism of injury, based on the police report, where the 18-wheeler came into her lane and scraped along the side of her vehicle forcing her to swerve onto the medium." Thereafter, the trial court

8

instructed that "[h]e can answer it within the confounds of my instructions, but that answer is going beyond the scope." Plaintiffs further take issue with the following colloquy that occurred after the aforementioned court instruction:

> Q. Without describing the July accident, Doctor, if you simply just plucked it out of her history . . . and you look at all of the records of her medical treatment, does it still make perfect sense to you as a clinician diagnosing her pain generator?
>
> A. Yes, it does. It – I still believe that the 2011 incident injured both the – the C5,6 disc and – probably one of the C-5,6 facet joints."

The trial court also stated to counsel, in the absence of the jury, that "Dr. Aprill . . . after some stopping and redirecting he has testified within the bounds of the parameters that I think the law and the [c]ourt has set."

We find no abuse of discretion in the trial court's evidentiary rulings concerning Dr. Aprill's testimony. The trial court stopped Dr. Aprill from providing his own opinion as to the mechanics of the accidents, and it allowed Dr. Aprill to offer his opinion on causation of Mrs. Moffett's injuries based on his review of the information provided to him. The medical records reviewed by Dr. Aprill, and Mrs. Moffett's own testimony, made clear that the October 2011 accident was a rear-end collision wherein she hit her head on the steering wheel, and that she was side-swiped by the 18-wheeler in connection with the July 2012 accident.

## DAMAGES

*Standard of Review:*

As recognized by the Louisiana Supreme Court in *Guillory v. Lee*, 09-75, p. 14-16 (La. 6/26/09), 16 So.3d 1104, 116-118 (internal citations omitted):

> It is well-settled that a judge or jury is given great discretion in its assessment of quantum, both general and special damages.

9

Louisiana Civil Code article 2324.1 provides: "In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury." Furthermore, the assessment of quantum, or the appropriate amount of damages, by a trial judge or jury is a determination of fact, one entitled to great deference on review. This court has noted:

> [T]he reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.

Because the discretion vested in the trier of fact is so great, and even vast, an appellate court should rarely disturb an award on review.

The role of an appellate court in reviewing a general damages award, one which may not be fixed with pecuniary exactitude, is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. This court has long held true to the following principle:

> [b]efore a Court of Appeal can disturb an award made by a [factfinder,] the record must clearly reveal that the trier of fact abused its discretion in making its award. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court.

> . . . . Furthermore, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Moreover, on review, an appellate court must be cautious not to re-weigh the evidence or to substitute its own factual findings just because it would have decided the case differently. Reasonable persons frequently disagree about the measure of damages in a particular case. "It is only when the award is,

in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award."

Special damages are those which have a "ready market value," such that the amount of damages theoretically may be determined with relative certainty, including medical expenses and lost wages. An appellate court, in reviewing a jury's factual conclusions with regard to special damages, must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusions, and the finding must be clearly wrong.

## Lost Wages

Plaintiffs contend that the jury erred in failing to award Mrs. Moffett lost wages in the amount of $22,800, which they calculate based on the amount of work Mrs. Moffett was required to miss because of the July 2013 cervical surgery. Plaintiffs suggest that since the jury awarded $3,000 in lost wages, it must have intended to award her for lost wages stemming from the cervical surgery because lost wages from the surgery was the only evidence of lost wages presented to the jury. Therefore, according to Plaintiffs, it was error to only award $3,000 rather than the entire $22,800.

We disagree with Plaintiffs' suggestion that the only evidence of lost wages was related to the cervical surgery. There is evidence in the record that, at the time of the July 2012 accident, Mrs. Moffett was on medical leave from her job as a paralegal at a law firm because she was recovering from her earlier carpal tunnel surgeries. According to Dr. Blanda's medical record dated September 18, 2012, which is eight weeks after the 2012 accident, she was released to light duty work from those surgeries. Then, according to Dr. Blanda's November 20, 2012, which is seventeen weeks after the 2012 accident, she was fully released from Dr. Blanda's care related to the carpal tunnel surgeries. There was also evidence

11

indicating that prior to those surgeries, Mrs. Moffett made $15 per hour and worked forty hours a week.

The jury awarded Mrs. Moffett $3,000 in lost wages, which is equivalent to five-weeks of pay. This award supports a finding that the July 2012 accident exaggerated Mrs. Moffett's prior wrist injuries and/or prolonged her recovery from the carpal tunnel surgery. Given that she was recovering from the carpal tunnel surgery at the time of the July 2012 accident, we cannot say that awarding Mrs. Moffet five weeks of pay out of the eight weeks until she was released to light duty work following her carpal tunnel surgery, or seventeen weeks until she was fully released, is manifestly erroneous under the evidence presented to the jury.

We next consider whether the jury was manifestly erroneous in failing to award Mrs. Moffett lost wages associated with the cervical surgery. The jury's lost wages award, coupled with its award of $11,500 in medical expenses, which is far less than the cost of the cervical surgery, indicates that the jury found Mrs. Moffett's injuries necessitating cervical surgery were not related to the July 2012 accident. Plaintiffs' rely on Dr. Bozzelle's and Dr. Blanda's medical records and testimony in arguing that the jury's finding was manifestly erroneous.

Dr. Blanda, who performed the cervical surgery, provided the following opinion as to causation of the injuries that required surgery:

> Well you know you put everything together she initially saw me for carpal tunnel, she had a negative MRI during that period of when she was being treated. She gets in a new injury or has a new accident, worsening symptoms. The MRI went from normal to positive and her EMG went from carpal tunnel to radiculopathy so it all fits that the second injury probably was the reason she needed the neck surgery.

Dr. Blanda initially recommended a two-level cervical surgery based on his review of Mrs. Moffett's MRIs and EMGs received from Dr. Bozzelle; however,

12

prior to surgery, he ordered another MRI. He testified that because some time had passed since his initial recommendation for surgery, and because of a "conflicting report on the – the preoperative MRI[,]" as compared to the one ordered by Dr. Bozzelle, he ordered a discogram prior to the surgery.

The discogram revealed an annular tear. According to Dr. Blanda, the discogram "had pretty much found that the C-4,5 disc was not causing symptoms and it was only the C-5,6 disc." Therefore, he performed the cervical surgery only related to the C-5,6 disc, rather than a two-level surgery as initially recommended. The discogram was the only diagnostic test given to Mrs. Moffett following the October 2011 accident that was capable of definitely showing an annular tear. Dr. Bozzelle testified that a discogram is the best test for discogenic pain, but that he does not perform discograms.

Defendants called Dr. Charles Aprill to testify as to causation of Mrs. Moffett's injuries necessitating cervical surgery. Dr. Aprill was admitted as an expert in radiology with a special expertise in the evaluation of adult spine disorders. He indicated that he did not physically examine Mrs. Moffett because she had already had the cervical surgery by the time he became involved in this case; however, in forming his opinions, he reviewed Mrs. Moffett's medical records from 2011 through 2014, including her massage therapy and physical therapy records; the emergency room record following the 2011 accident; and the accident report and photographs pertaining to the 2012 accident.

Dr. Aprill testified that, in his opinion, the October 2011 accident likely caused the discal injury that required cervical surgery and that Mrs. Moffett:

> also likely injured one or more of her facet joints in [the 2011] accident. The reason being, from a statistical point of view it's 2 to 1 times more often that you injure both discs and facet as opposed to

13

only disc or only facet. . . .  If the facet joints were the sole cause of pain the radiofrequency ablation would have eliminated that pain. . . .

. . . .

Two months after the RF[A] procedure on the right [following the October 2011 accident] she had tenderness on the right side of the neck at the base of the neck going to the posterior shoulder girdle and interscapular region[.] . . .  That is the reference zone from the C-5,6 segment.

. . . .

Now, if she had a facet and a disc injury and if he did an ablation of the facet and if it did not make the pain go away completely, then there's another pain source. . . .  The discogram documented abnormality of the C-5,6 disc.  Fits perfectly.  Once the disc was replaced and she had the interior surgical fusion by Dr. Blanda, all of her symptoms got better, including arm symptoms.

Dr. Aprill then testified as to his opinion concerning Mrs. Moffett's MRIs. In connection therewith, he reviewed each MRI with the jury and explained his conclusions in detail.  He explained that the MRI performed November 1, 2011, less than a month after the October 2011 accident, showed that Mrs. Moffett's spine was curving backward instead of forward and that the most common cause of this is increased muscle tension.  He also noted a "very subtle prominence" behind the C-5,6 disc.  However, according to Dr. Aprill, the prominence did not qualify as a "disc protrusion" and it was "not necessarily abnormal" in women in their 40s, like Mrs. Moffett.  Therefore, he concluded that there was nothing suggesting a definitive abnormality "other than the fact that the curve is reversed and that implies there was likely some sort of structural injury."

Dr. Aprill also reviewed the September 5, 2012 MRI, which was performed after the July 2012 accident, and was the one that Dr. Bozzelle relied on in suggesting that Mrs. Moffett had a two-level disc herniation.  Dr. Aprill explained in detail why the MRI did not show a herniated disc at any level, stating "[i]f there

14

was a herniation you would see this black material here extending backward and deforming this white cylinder[,]" which is the spinal fluid, and that "this scan looks exactly like the first scan. There's no change in the 4,5 or 5,6 discs."

With respect to the September 5, 2012 MRI, Dr. Aprill did note that the back of C-4 was a "little bit" more prominent than the first MRI, and that C-5,6 was a "little bit" prominent; however, he explained that these subtle changes in appearance were not uncommon when a patient is scanned multiple times. He further indicated that, in connection with the third MRI on June 8, 2013, "what was more prominent at 4,5 is less prominent. And what was more – you're still a little more prominent at 5,6 but it's less than it was last time. That's within the limits of variation of scan parameters. It just happens."

Dr. Aprill further reviewed the June 8, 2013 MRI in detail with the jury. He concluded that C-4,5 was again normal with no herniation and that "[t]here is simply no disc herniation" as to C-5,6 either. He also noted that "this does not mean there's nothing wrong with the disc. . . . I'm saying there is no disc protrusion here. Can there be an annular tear, and injury to the annulus of the disc which is causing pain? The answer is absolutely yes. It can't exclude that."

Dr. Aprill then noted that the discogram ordered by Dr. Blanda prior to the cervical surgery,

> showed the 4,5 disc to be totally normal. It showed the 6,7 disc to be totally normal. It was an absolute abnormal discogram at C-5,6. It was abnormal by every criteria we use in discography. Provocation meaning when he stimulated that disc it provoked her pain and when he anesthetized that disc, . . her pain went away temporarily. . . . The C-5,6 disc was abnormal, the adjacent discs were not."

Dr. Aprill also noted that Mrs. Moffett's symptoms following the 2011 accident did not completely resolve until after the cervical surgery. He explained

that he also considered the following in connection with his causation analysis: Mrs. Moffett continued to take pain medicine following the carpal tunnel surgeries and the RFA, presumably because she was still having pain; she did not have the same immediate pain reaction following the 2012 accident as she did in connection with the 2011 accident; and C-5,6 coordinates with the area that Dr. Bozzelle explained as the location of her pain following the 2011 accident.

Defendants also called Dr. James Domingue, who was accepted by the trial court as an expert in the field of neurology and clinical neurophysiology. Dr. Domingue provided his opinions concerning Mrs. Moffett's two EMGs and nerve conduction studies performed by Dr. Bozzelle, concluding that neither the December 2, 2011 study, nor the November 2, 2012 study after the July 2012 accident, revealed radiculopathy.

As to the study dated November 2, 2012, Dr. Domingue disagreed with Dr. Bozzelle's opinion that it showed a three-level radiculopathy, stating: "My opinion is and was that the study does not provide any evidence of radiculopathy, that is a disorder of the nerve root. One cannot conclude from this study that a radiculopathy exists." Dr. Domingue then reviewed the November 2012 study with the jury. He explained in detail the EMG and study procedure and provided a thorough and technical explanation of the findings, noting that the study needed to show two abnormalities in order to identify a radiculopathy, and since there was not a second abnormality, the finding was "meaningless."

Keeping in conformity with the requisite standard of review enunciated in *Guillory*, 16 So.3d 1104, we conclude that there is a reasonable factual basis for the jury's conclusion that the cervical surgery was not causally related to the July

2012 accident. Therefore, its decision to not award Mrs. Moffett lost wages stemming from recovery from the cervical surgery was not clearly erroneous.

**Medical Expenses**

Plaintiffs also seek to increase the jury's award of $11,500 for medical expenses to the full amount of medical expenses she incurred from July 2012 accident, which is $117,963.22. They suggest that the jury's award of lost earnings and disability prove that all of Mrs. Moffett's treatment was causally related to the surgery.

How the jury calculated the $11,500 awarded is unclear. Nevertheless, as noted above, since this amount does not cover the $75,000 cervical surgery, the jury seemingly concluded that Mrs. Moffet's discal injury necessitating the cervical surgery was not caused by the July 2012 accident. As discussed above, this conclusion is supported by the record.

However, the jury's award of lost wages and general damages indicates that it found that *some* of Mrs. Moffett's injuries and complaints were related to the July 2012 accident. So we must consider whether the award of $11,500 in medical expenses associated therewith is supported by the record.

As discussed above, the jury seemingly concluded that the July 2012 accident aggravated Mrs. Moffett's pre-existing wrist injury and prolonged her recovery from carpal tunnel surgery, and it awarded her five-weeks of lost wages associated therewith. Therefore, Mrs. Moffett is at least entitled to five-weeks of medical expenses incurred related to her wrist from the July 2012 accident.

We further note, as do Defendants, that there was evidence that Mrs. Moffett injured her ankle in connection with the July 2012 accident and that she did not have a pre-existing ankle injury. Specifically, Dr. Bozzelle's report dated August 3,

2012, reflects that Mrs. Moffett had bilateral ankle pain and swelling and significant trouble walking. She further underwent massage therapy and physical therapy related to her ankle pain. The physical therapy record dated September 26, 2012, reflects Mrs. Moffett's indication that she had not experienced ankle pain for several days, and Dr. Bozzelle's medical record dated October 30, 2012 confirmed that "her ankle pain does not really give her much trouble at this point." Defendants do not point to any evidence suggesting that Mrs. Moffett's ankle pain was not caused by the July 2012 accident.

We therefore conclude that Mrs. Moffett is entitled to the cost of her medical expenses incurred from the date of the July 2012 accident through September 26, 2012, which is the date that she no longer had ankle pain. This time period includes the five weeks that the jury attributed to the aggravation of her wrist injury as well. According to the medical bills provided, the amount of medical expenses incurred during this timeframe equals $14,947.00. Therefore, we find that the jury's award of $11,500 in medical expenses was manifestly erroneous and increase that award to $14,947.00.

## General Damages

The jury awarded a total of $25,500 in general damages as follows: $23,000 for past, present, and future physical pain and suffering and $2,500 for physical disability. Plaintiffs argue that the jury abused its discretion and that these awards are unreasonably low. We review these general damages awards together under the abuse of discretion standard enunciated in *Guillory,* 16 So.3d 1104.

Plaintiffs argue that these awards were abusively low because of Dr. Blanda's opinion that the cervical surgery resulted in a 20% impairment and because Mrs. Moffett's neck pain and headaches did not resolve until after the

18

cervical surgery. Therefore, according to Plaintiffs, we should take into consideration general damages related to Mrs. Moffett's disc injury and resultant cervical surgery.

However, as noted above, the record supports a finding that the cervical surgery was not causally related to the July 2012 accident; therefore, we disagree with Plaintiffs' argument. Rather, we find that the general damages awarded are consistent with Mrs. Moffett's aggravated wrist injury and five weeks of treatment associated therewith awarded by the jury, as well as her ankle injury and two months of associated treatment. Therefore, we conclude that the jury's award was not manifestly erroneous.

## CONCLUSION

For the reasons set forth above, we increase the award of medical expenses to $14,947.00. We otherwise affirm the judgment in this matter. Costs of this appeal are divided equally between the parties.

**AFFIRMED AS AMENDED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2–16.3.